CITY OF NEW LISBON, Respondent, vs. HAREBO and others, Appellants.

*January 15—February 9, 1937.*

For the appellants there was a brief by *Goggins, Brazeau &* *Graves* of Wisconsin Rapids, and oral argument by *Theo. W.* *Brazeau.*

*C. E. Macomber,* city attorney, and *Frank H. Hanson* of Mauston, attorneys, and *Harold M. Wilkie* of Madison of counsel, for the respondent.

WICKHEM, J.   The original petition sets forth, (1) that the petitioner is a municipal corporation; (2) that the proceedings are for the purpose of "extending and enhancing the beauty of the public parks, parkways, and pleasure drives of the city of New Lisbon and to create as a part thereof a pond and artificial lake to be used solely for recreational and conservational purposes, which pond and artificial lake is to be created by constructing a dam across the 'Large' Lemonweir river, . . . approximately at the old damsite;" (3) that the hereinafter described lands cannot be acquired by gift, and that the petitioner has been unable to agree with the owners as to the value of said lands; (4) that said lands are entirely owned by Anton M. Harebo and Jennie Harebo, his wife, etc.; (5) that the lands are described as follows . . .; (6) that on the 4th day of September, 1936, a resolution was duly adopted by the common council of the city of New Lisbon, Juneau county, Wisconsin, authorizing and ordering the condemnation of said lands for the purposes set forth in Paragraph 2, and directing the city attorney of said city to commence and prosecute proper proceedings.   The amended

petition expands Paragraph 1 by alleging a resolution of the common council of March 30, 1936, to the effect that the taking of the land in question is necessary for the purpose of extending the parks, drives, etc., and that this resolution includes lands hereinbefore described and other lands necessary for the establishment of such improvements. The amended petition has attached to it as an exhibit a copy of this resolution. The contents of this resolution will be hereafter set forth.

No question is raised upon this appeal as to the appealability of the order, and it is considered that the case of *Freber v. Beaver Dam,* 205 Wis. 299, 237 N. W. 119, establishes the propriety of interposing a demurrer to a petition for condemnation by a municipality, and that the ruling upon demurrer is appealable to this court. It is held in the *Freber Case* that the petition in condemnation proceedings by a municipality is the commencement of an action and must state a cause of action. This it is contended the petition fails to do. The first defect asserted by respondents is that the petition fails to allege that a permit has been granted the city of New Lisbon to construct a dam across the Lemonweir river.

Sec. 31.04, Stats. 1935, prescribes that permits to construct a dam may be granted to municipalities. Sec. 31.06 (3), Stats., requires a hearing "and if it shall appear that the construction, operation or maintenance of the proposed dam will not materially obstruct existing navigation or violate other public rights and will not endanger life, health or *property,* the commission shall so find and *a permit is hereby granted to the applicant.*" It is to be noted that the commission does not grant a permit, but merely finds the statutory facts, and the permit is granted by the statute. Respondents contend that there is nothing in this section which requires an applicant to show that he owns the land or flowage rights, and that it would be putting the cart before the horse to require acquisition of lands before a permit could be acquired for the con-

struction of a dam. Petitioner's answer to this is, (1) that the petition and resolution of the council, reasonably construed, deal with the purchase or condemnation of lands for a park and recreational purposes and that the dam is a mere incident to that purpose; and (2) that since sub. (3) of sec. 31.06 requires a finding that the operation of the dam will not endanger property, it is fairly to be implied (as the commission has heretofore held) that no finding favorable to an applicant could be made until flowage rights had been acquired. In other words, there would necessarily be injury to property unless the applicant had already acquired the land subject to being flowed, or flowage rights therein.

After careful consideration, we have come to the conclusion that respondents' contentions are sound. Petitioner claims that this is a park project; that the dam is a mere incident to this project; and that the permit to maintain a dam has no bearing upon the right to condemn lands for park purposes. While this proposition may be legally sound, the difficulty is that the allegations of the petition, in our opinion, do not support it. By the amended petition a copy of the resolution of March 30, 1936, is attached to the petition, and the contents of this resolution rather than its characterization in the petition must, under familiar rules of pleading, govern our determination. *Freber v. Beaver Dam, supra.* The resolution of March 30, 1936, reads as follows:

"Wherefore, after due consideration, it is the opinion of the common council of the city of New Lisbon that it is for the benefit of the public, to the best interests of the public, and the welfare of the public, and that it is necessary and proper that a dam be erected to hold certain waters, at or about what is known as the 'Old Mill Dam Site' in the city of New Lisbon, county of Juneau, and state of Wisconsin, that certain lands be acquired for that purpose in order that an adequate park may be instituted and maintained, with proper parkways and drives convenient to the flowage which will result for the erection of said dam, said flowage to be a portion of a park project at, on and near the location of what

is generally known as the 'Old Mill Pond' within the limits of the city of New Lisbon and without said limits convenient thereto, and necessarily a part thereof, and it being necessary that lands be secured for said park, dam, damsite, and flowage, all a portion of said project and public playground as well, with parkways, drives and walks necessary for the establishment, layout and completion of such improvements,

"Be it resolved that the city acquire by gift, where possible, purchase, where possible, and condemnation of lands where neither gift nor purchase may be possible, of such lands as may be necessary for the establishing, laying out, and completion of such improvements that there may be an adequate park and playgrounds, including water facilities, for the necessity and best interests of the public and the public health and general public welfare, in the form of a lake to be created through the erection of said dam, and Mayor C. E. Robison, is hereby authorized, and directed to secure such lands as may be necessary, either by gift or purchase, and to act for and on behalf of the city with that end in view, as well as to prepare for and arrange for such condemnations of such lands as may be necessary, that there may be a complete establishment for the final complete layout and final completion of such improvement.

"Adopted the 30th day of March, 1936.

"Approved the 30th day of March, 1936. . . ."

In view of the form and content of this resolution, we cannot assent to the contention that the dam is a mere incident to or embellishment of a park project. If this were true, the dam need not even have been mentioned in a resolution, the purpose of which was to authorize the acquisition of land by gift, purchase, or condemnation. As the resolution is framed, the construction of the dam appears to be the principal purpose of the acquisition and the park an incident to it. At the very least, the park and the dam are put upon an equality, and lands appropriate and necessary for the maintenance of the dam are to be acquired for the separate and distinct purpose. At one point in the resolution it is stated to be necessary to acquire lands for the purpose of building the dam. At another it is recited to be necessary that lands be secured for

said park, dam, *damsite, and flowage.* We cannot escape the conclusion that the resolution contemplates that lands appropriate for the purpose of a damsite and lake are to be acquired for that separate and distinct purpose. Thus, for the purposes of this contention, it must be considered as though the acquisition of the damsite were the only project involved and it becomes necessary to consider petitioner's contention that a permit need not be had and, indeed, cannot be had until condemnation of the requisite lands or flowage rights. While an able argument is offered in support of this contention, we are of the view that it cannot be sustained.

Sec. 31.02, Stats., commits to the public service commission of Wisconsin "in the interest of public rights in navigable waters or to promote safety and protect life, health and property," the regulation and control of the level and flow of waters in all navigable waters. Sec. 31.05, Stats., contains eight separate statements of fact which must be contained in every application filed with the commission for a permit. None of these requirements include a representation in a case of municipalities or any taking for a public purpose that even the damsite is the property of the applicant (although this must be alleged in cases of dams for private uses). There is no requirement of an allegation that ownership of or flowage rights in lands which will be flowed as a result of the construction and maintenance of the dam have been acquired. Sec. 31.06 requires that there be a hearing and that the commission take evidence. The statute itself grants a permit upon a finding by the commission that the construction, operation, or maintenance of the proposed dam will not materially obstruct existing navigation or violate other public rights and will not endanger life, health, or property.

In considering what meaning is to be ascribed to the term "property" as used in sec. 31.06, Stats., consideration must be given to the evident purpose of the entire chapter. We find precisely the same formula in sec. 31.02, which is definitive of the powers of the commission with respect to waters

and which states the purposes of committing the level and flow of navigable waters to the regulation of the commission. Aside from a purpose to promote public rights in navigable waters, the objective is to promote safety and protect life, health, and property by preventing the erection of dams that are inherently dangerous in these respects. Thus, a dam which will necessarily produce stagnant water may be detrimental to public health. One that by reason of its location, or manner of construction, or the character of the soil upon which it is built, will be dangerous to life and property in time of flood or freshet, either because it will tend to flood cities or villages or because it is likely to give way and create havoc and destruction below the dam would be within the statutory definition of a dangerous structure. In such cases a finding that the dam would be dangerous to life, health, and property is proper, and we are of the opinion that this is as much as the section can be held to mean. It is not proper to isolate the word "property" and assert that injury to property means normal flowage by the ordinary operation of the dam, since this is the inevitable consequence of building and maintaining a dam. Particularly in view of the very explicit directions in sec. 31.05 as to the contents of an application for permits and the significant absence in cases of taking for public use of any required allegation that even the damsite has been acquired, and the simple requirement of an allegation that it has been acquired in cases of applications for dams for private purposes, we cannot conclude that the mere requirement that dams may only be built if their construction and maintenance does not endanger property, requires a showing that full flowage rights have been obtained as to all lands affected by the dam. Nor would such a conclusion in our judgment be a practical construction. The precise effect upon near-by lands of building and maintaining a dam can never be discovered in advance with mathematical accuracy. The possibility of the backing up of percolating waters is always present, and flooding in wholly unanticipated places may be

consequences of building the dam. It is difficult for us to see how any permit could ever be issued if it must await a showing that all of the property which will be flooded by the dam in question has either been acquired or flowage rights secured.

A further consideration fortifies this conclusion. It is elementary that a municipal corporation may only exercise the power of eminent domain for some public purpose authorized by the statute or constitution. If condemnation of lands for a damsite and flowage were to be permitted prior to the issuance of a permit, which might conceivably never be issued, it is impossible for us to see how at the time of the condemnation proceedings the taking can be said to be for public purposes. The municipal corporation must be able to show at the time of its petition for condemnation that it has a right to construct a dam. In *Minnesota Canal & Power Co. v. Pratt,* 101 Minn. 197, 112 N. W. 395, 403, it is said:

"The petition is presented to the court by a corporation which under the laws of the state is granted the power of eminent domain in aid of the specific enterprise described in the petition. . . . It will not do to say that these landowners are not interested in the matter of obtaining the consent of the United States government. Their property can be taken only for a public purpose and for the specific public purpose described in the petition. If the land is taken, it may never be used for that purpose, because the petitioner may not be able to obtain the necessary authority. It is not a mere formality granted upon application as a matter of course, as the petitioner must have learned from the history of the proceedings as stated in the briefs. The landowner has a right to demand that the petitioner allege and show that the works which it intends to construct with the aid of his land can be constructed under the existing laws."

The next contention of respondents is that sec. 62.23 (4), Stats., which gives the city the right to construct a dam for the improvement of rivers, provides only that the city may so improve rivers "within the city and establish the shore lines thereof so far as existing shores are marsh." It is respond-

ents' claim that this authority is not extensive enough to warrant erection and maintenance of a dam for the purpose of creating an artificial lake without the city. It is also contended that the remainder of this act which provides that "where a navigable stream traverses or runs along the border of a city, such city may make improvements therein throughout the county in which such city shall be located in aid of navigation, and for the protection and welfare of public health and wild life," is not broad enough to include the project for a dam set forth in the petition. Petitioner claims that by the terms of sec. 27.08 the city is authorized to acquire in the name of the city for park, boulevard, or pleasure drive purposes, any property within or without the city, and that this is broad enough to authorize the condemnation. We are of the opinion that sec. 27.08 is broad enough in cases of park projects to empower the city to do such acts as are reasonably incident to the construction and maintenance of a park. The erection of a dam and the maintenance of an artificial lake would seem to be well within this purpose. Thus, the fact that a city has the undisclosed intention to devote a portion of the park to a lake created by damming a navigable stream would not affect its right to condemn lands without the city for park purposes. Having acquired the lands for such purposes, it would have the power, as an incident to its right to maintain the park, to build the dam, provided the public service commission should find that the dam did not constitute an undue interference with or impairment of the navigable stream involved, and provided the dam did not endanger life, health, or property. However, this question is not here because of our determination that at least one of the purposes of the resolution is the acquisition of the damsite. If the city proposes, as a separate and distinct project, to acquire a damsite, then the provisions cited by respondents are applicable and are not broad enough to warrant condemnation proceedings.

It is next contended that the petition is fatally defective in that it does not appear that the council has ever determined and declared the necessity for condemning the lands of respondents. Sec. 62.22 (4) (d), Stats., provides:

"The council may, without a petition, by resolution declare it necessary to condemn land, describing it, for any authorized purpose, and direct the city attorney to prosecute condemnation proceedings therefor. If the purpose is the opening, widening, extension, or change of a street or alley, the resolution must be adopted by a vote of four-fifths of all the members. Before adopting the resolution it shall be referred to the board of public works, who shall make a particular description of each lot, parcel or subdivision of land proposed to be taken, and a plat of the proposed street or alley, drain or water pipe, or land to be used for other authorized purposes, and report the same to the council."

It is evident that the resolution of March 30th, while it might be construed as declaring the necessity for taking some lands for a damsite and for park purposes, contains no declaration as to the necessity of taking any particular or described property for such purposes. This the statute requires, and this requirement may not be read out of the statute by construction. The resolution of March 30th merely declares the desirability of the projects, the necessity of condemning lands for this purpose, and delegates to the mayor the authority to secure such lands as may be necessary and to arrange for condemnations wherever necessary. This is an insufficient declaration of necessity, and under the rule as stated in the *Freber Case, supra,* the petition of March 30th is an insufficient basis for condemnation. It is claimed, however, that the sixth paragraph of the petition cures this defect. The allegation of this paragraph is—

"That on the 4th day of September, 1936, a resolution was duly adopted by the common council of the city of New Lisbon, Juneau county, Wisconsin, authorizing and ordering the condemnation of lands hereinbefore described for the pur-

poses fully set forth in paragraph 2 herein, and directing the city attorney of said city to commence and prosecute the proper proceedings."

There is no allegation, however, that this resolution, which is not attached as an exhibit, contained any declaration as to the necessity for acquiring these lands or that it included by incorporation the declarations of necessity contained in the resolution of March 30th. The resolution as summarized by the petition is plainly insufficient under the doctrine of the *Freber Case*. Thus, the record as we have it shows a wholly defective resolution declaring the general necessity of acquiring lands sufficient to complete the project, and a later resolution merely ordering the condemnation of respondents' lands for the purposes set forth in the earlier resolution. We are of the view that this does not satisfy the requirement that the council must by resolution declare the necessity to condemn land, describing it. It may, of course, be that the resolution itself is more explicit than the allegations concerning it. In this case the particular defect can be remedied by filing an amended petition containing as an exhibit a copy of this resolution, but as the record stands, we conclude that it does not show a resolution declaring it necessary for an authorized purpose to condemn respondents' land.

The defects in the petition heretofore discussed are substantial, and, in view of the fact that condemnation statutes are in derogation of common law and must be strictly complied with, we see no escape from the conclusion that the petition is fatally defective. It follows that the order of the trial court must be reversed.

*By the Court.*—Order reversed, and cause remanded with directions to sustain respondents' demurrer.