ROCK-KOSHKONONG LAKE DISTRICT,
Rock River-Koshkonong Association, Inc. and
Lake Koshkonong Recreational Association, Inc.,
Petitioners-Appellants,†

v.

STATE of Wisconsin Department of Natural
Resources, Respondent-Respondent,

LAKE KOSHKONONG WETLAND ASSOCIATION, INC.
and Thiebeau Hunting Club,
Intervenors-Respondents.

Court of Appeals

*No. 2008AP1523. Submitted on briefs March 6, 2009.
—Decided July 21, 2011.*

2011 WI App 115

(Also reported in 803 N.W.2d 853.)

† Petition for Review Filed.

677

On behalf of the petitioners-appellants, the cause was submitted on the brief of *William P. O'Connor* and

*Mary Beth Peranteau* of *Wheeler, Van Sickle & Anderson, S.C.*, Madison; and *Arthur J. Harrington* and *Douglas M. Poland* of *Godfrey & Kahn, S.C.*, Milwaukee.

On behalf of the respondent-respondent, the cause was submitted on the brief of *JoAnne F. Kloppenburg*, assistant attorney general, and *J.B. Van Hollen*, attorney general.

On behalf of the intervenors-respondents, the cause was submitted on the brief of *Charles V. Sweeney* and *Mitchell R. Olson* of *Axley Brynelson, LLP* Madison.

Before Vergeront, P.J., Lundsten and Higginbotham, JJ.

¶ 1. HIGGINBOTHAM, J.    This is an appeal of a Wisconsin Department of Natural Resources (DNR) order setting target water levels for Lake Koshkonong, an impounded lake on the Rock River. The Rock-Koshkonong Lake District, Rock River-Koshkonong Association, Inc. and Lake Koshkonong Recreational Association, Inc. (collectively, "the District") petitioned the DNR to raise the water levels of Lake Koshkonong. The DNR issued an order rejecting the petition, which was affirmed by an administrative law judge (ALJ) and the circuit court.

¶ 2.    At issue is the DNR's interpretation and application of WIS. STAT. § 31.02(1) (2009–10),[1] which grants the agency authority to establish water levels for impounded lakes. Section 31.02(1) authorizes the DNR to set water levels "in the interest of public rights in navigable waters or to promote safety and protect life, health and property." The District's challenges to the

---

[1] All references to the Wisconsin Statutes are to the 2009–10 version unless otherwise noted.

ALJ's decision concern whether the DNR considered all the factors § 31.02(1) properly requires and allows. The District does not challenge any of the ALJ's factual findings.

¶ 3. The District makes three arguments on appeal: (1) Wis. Stat. § 31.02(1) requires the DNR, under its authority to "protect . . . property," to consider the potential economic effects the DNR's water level determination has on residential property values, business income and tax revenues, and the DNR's failure to consider such economic effects was erroneous; (2) the DNR exceeded the scope of its authority granted by § 31.02(1) when it considered the potential effects of proposed water levels on private, non-navigable wetlands; and (3) the DNR exceeded the scope of its authority under § 31.02(1) by considering wetland water quality standards under Wis. Admin. Code § NR 103 in setting the water levels for the lake.

¶ 4. Applying de novo review to the DNR's interpretation and application of Wis. Stat. § 31.02(1), we conclude that: (1) the only reasonable construction of "protect . . . property" under the statute does not require the DNR to consider the economic effects of its water level determinations on residential property values, business income and tax revenue; (2) the DNR did not exceed the scope of its authority under § 31.02(1) by considering the potential effects proposed water levels would have on adjacent wetlands; and (3) the DNR did not exceed the scope of its authority under the statute by considering wetland water quality standards under § NR 103. Accordingly, we affirm the circuit court order affirming the DNR's order.

## I. Procedural History and the Water Level Petition

¶ 5.   In 2003, the Rock-Koshkonong Lake District petitioned the DNR to raise the water levels of Lake Koshkonong from those established in a 1991 DNR order, and to eliminate a winter level "draw down" set by the 1991 order. The following table shows the changes sought by the District's petition, expressed in feet above mean sea level:

| Period | 1991 Order | Petition | Change |
|---|---|---|---|
| *May through October (Summer)* | | | |
| Target | 776.20 ft. | 776.8 ft. | + 0.6 ft. (7.2 inches) |
| Maximum | 776.33 ft. | 777.00 ft. | + 0.67 ft. (8 inches) |
| Minimum | 775.73 ft. | 776.4 ft. | + 0.67 (8 inches) |
| *November through April (Winter Draw Down)* | | | |
| Maximum | 775.77 ft. | 777.00 ft. | 1.23 ft. (14.8 inches) |
| Minimum | 775.00 ft. | 776.4 ft. | 1.4 ft. (16.8 inches) |

¶ 6.   The DNR determined that it was required to complete an environmental assessment to evaluate whether an environmental impact statement would be required. A draft assessment was issued in December 2004, and, after taking public comment, the DNR certified the assessment as complete and determined an environmental impact statement was not required.

¶ 7.   In April 2005, the DNR issued an initial order denying the District's petition, reestablishing the maximum summer water level set in the 1991 order, and increasing the minimum winter draw-down water level by six inches. The District, joined by the Rock River-Koshkonong Association, Inc. and the Lake Koshkonong Recreational Association, Inc., sought a con-

682

tested case hearing under Wis. Stat. § 227.42 on the denial of the water level petition.

¶ 8.    The contested case hearing was held over ten days in March and April 2006 before an ALJ of the Department of Administration Division of Hearings and Appeals. The parties filed post-hearing briefs as well as supplemental briefs on a question of law. The ALJ sustained the DNR's proposed order, and the DNR subsequently adopted the ALJ's order as its own pursuant to Wis. Stat. § 227.46(3)(a). We refer to the order as the DNR's order hereinafter. The District sought certiorari review of the DNR's order in circuit court. The circuit court affirmed the order, and the District appeals.

## II.   The DNR's Order

¶ 9.    The DNR's order contains 120 paragraphs of factual findings, none of which are disputed by the District on appeal. The essential background facts and key findings relating to the District's petition to raise water levels on Lake Koshkonong are as follows.

### a.   Parties

¶ 10.    The Rock-Koshkonong Lake District is a public inland lake protection and rehabilitation district established pursuant to ch. 33 of the Wisconsin Statutes. The District owns and operates the Indianford Dam, which it acquired from Rock County in 2004. The Rock River-Koshkonong Association, Inc. and the Lake Koshkonong Recreational Association, Inc., are local business and recreational groups. The DNR regulates the operation of Indianford Dam pursuant to Wis. Stat. § 31.02.

### b.  Lake Koshkonong and Indianford Dam

¶ 11.  Lake Koshkonong is a natural widening of the Rock River beginning four miles downstream from the City of Fort Atkinson in Jefferson County and ending six miles upstream from the Indianford Dam in Rock County. Although Lake Koshkonong is the sixth largest inland lake in the state by surface area, it is very shallow, with a maximum depth of about seven feet and an average depth of about five feet. From the shoreline, water depths of only one to two feet can extend hundreds of feet into the lake. Lake Koshkonong has twenty-seven miles of shoreline, approximately ten of which is developed primarily for residential use. Roughly twelve and two-fifths miles of the shoreline is undeveloped wetlands.

¶ 12.  The Indianford Dam is six miles downstream from Lake Koshkonong on the Rock River. The dam's construction was authorized by the Wisconsin Territorial Legislature in the mid-1800's. Modifications made to the Indianford Dam in 1917 raised the water level of Lake Koshkonong about two feet, transforming the ecology of the area from that of a densely vegetated riverine marsh to a shallow lake surrounded by a remnant marsh community. Once used to generate hydroelectric power, the dam was abandoned for that purpose in 1962 and gradually fell into disrepair. The dilapidated condition of the dam from the 1960s to 2002 affected the ability of the dam to effectively regulate water levels on Lake Koshkonong. As a result, actual water levels were generally higher than target levels set by the DNR. In 2002, the dam was repaired and is now able to maintain DNR target water levels.

### c. Wetland Complexes

¶ 13. Wetlands in and around Lake Koshkonong cover between 3080 and 4000 acres. Chief among these are: Koshkonong Creek, 278 acres of shallow marsh and floodplain forest; Krumps Creek, 335 acres of shallow marsh; Mud Lake, 921 acres of shallow marsh; the state-owned Koshkonong Wildlife Area, 715 acres of shallow marsh, shrub/carr, and wet or sedge meadow, designated as an area of "special natural resource interest" under Wis. Admin. Code § NR 103.04; Otter Creek, 334 acres of shallow marsh and floodplain forest; and Thiebeau Marsh, 494 acres of shallow marsh, shrub/carr, and wet or sedge meadow. The ALJ found significant erosion had occurred to many of these specific wetlands since implementation of the 1991 DNR water level order.

### d. Effects of the District's Proposed Water Levels

¶ 14. Based on testimony of several expert witnesses for both parties, the ALJ made detailed findings regarding the effects increased water levels would have in the following areas.

### 1. Water Quality

¶ 15. Lake Koshkonong has been determined to be an impaired water body under § 303(d) of the Clean Water Act, with the listed pollutants being phosphorus and sediments, and the listed impairments as eutrophication, sedimentation, and loss of habitat. An increase in water level would likely cause increased sedimentation, a result that would be contrary to the Clean Water

Act's goal of removing impairments in bodies of water listed as impaired.

¶ 16. Higher year-round water levels proposed by the District would accelerate and deepen the erosion of wetlands. Higher water levels would likely lead to further loss of submerged aquatic vegetation because less light will reach the submerged plants through the deeper, turbid waters. Wetlands with dense, submerged aquatic vegetation promote clearer water by inhibiting turbidity. Finally, higher levels will increase wetland losses and thereby reduce the area's ability to slow flood and stormwater and to filter nutrients, sediments and other pollutants, resulting in increased levels of pollutants flowing downstream.

### 2. Ordinary High Water Mark (OHWM)

¶ 17. The District's proposal would likely increase the current representative OHWM of 778.11 feet, while enforcement of DNR's 1991 water level order would likely reduce the OHWM over time.

### 3. Erosion Protection from Riprap Structures

¶ 18. Rock riprap breakwater materials protect about 38% of the lake's wetland shoreline against wave action from the lake and flow-through. Higher water levels would increase the incidence of flow-through and over topping, and cause the structures to degrade more rapidly.

### 4. Wildlife

¶ 19. Continued loss of all submergent and emergent wetland habitat and floodplain forest habitat

caused by higher water levels will lead to continued incremental loss of herptile (reptile and amphibian) populations. Increased water levels will result in decreased suitable habitat for a variety of bird species, including several species listed as "threatened" or of "special concern."

### 5. Winter DrawDown

¶ 20. The District's proposal to eliminate the winter water level drawdown would have mostly detrimental effects. The winter drawdown reduces shoreline erosion and reduces the incidence of damage to riprap structures by ice. The drawdown causes all fish, including carp, to leave the shallow marshes during the winter months, thereby improving water quality by decreasing kick up of bottom sediments. The drawdown also preserves fish spawning habitat by preventing further loss of wetlands. However, drawdown levels would impair ice fishing conditions and make marsh areas less accessible for waterfowl hunting.

### 6. Agricultural Drainage

¶ 21. Jefferson County administers a drainage system for the use of area farmers to drain lands that would otherwise retain too much water to permit cultivation. The higher water levels sought by the District would adversely affect parts of the drainage system causing slower drainage, thus potentially delaying planting and reducing crop yields.

### 7. Public Access

¶ 22. In 2000, the District conducted a formal survey of lake users and found 81% of respondents

believed public access to the lake was adequate, and the remaining 19% believed otherwise. When asked what the "most negative aspect" of the lake was, 5% named poor public access while 54% responded with "worsening water quality." At most of the public landings on the lake, boat launching conditions for an 18–foot long V-hull boat are poor at the DNR's summer target level of 776.2 feet, and only marginally better at the District's proposed target level of 776.8 feet. The Rock River has a number of boat access points of sufficient depth to launch any recreational craft suitable for Lake Koshkonong when lake levels are at 775.70 feet.

### 8. Riparian Access

¶ 23.   A majority of residential and business riparian owners on Lake Koshkonong support the District's petition to raise water levels to improve riparian access and scenic beauty. The District's 2000 survey of riparian owners showed that 81% of respondents reported that low water levels adversely impacted their enjoyment of the lake "much," "very much" or "medium." Increasing water levels to the District's proposed targets would allow many owners to maintain shorter piers to reach water depths of two to three feet. Under the District's proposal, some piers could be shortened by 100 feet or more. Riparian owners keep boat lifts and shore stations closer to shore and in waters of greater depth at the District's proposed levels. Higher water levels would bring swimming and bathing activities closer to the shoreline.

### 9.   Natural Scenic Beauty

¶ 24.   For many residential riparian owners, full pool levels are aesthetically preferable to the exposed

lakebed that prevails during the winter drawdown and at lower water levels. However, the ALJ found that the loss of biologically diverse wetlands to proposed higher water levels would degrade the natural scenic beauty of the lake ecosystem for many users.

### 10. Navigability—Boating, Fishing, Recreation, Public Safety

¶ 25.   At the District's target water levels, recreational and public safety watercraft would be able to navigate closer to the shoreline of Lake Koshkonong, particularly along the more developed shorelines. This would improve the ability of rescue personnel to respond to some emergency situations. The increased water levels also heighten the risk of boating accidents by enticing some boaters to travel faster and closer to shore. Even under the proposed higher water levels, Lake Koshkonong would continue to be a shallow lake, and shallow depths would continue to impede emergency rescue and public safety efforts from time to time.

### e.   Interpretation of WIS. STAT. § 31.02(1) and Application to the Facts

¶ 26.   The DNR is empowered by WIS. STAT. § 31.02(1) to "regulate and control the level and flow of water in all navigable waters" "in the interest of public rights in navigable waters or to promote safety and protect life, health and property."

¶ 27.   At the contested case hearing, the District called two experts who testified that recent enforcement of the water level targets in the 1991 DNR order had harmed residential property values and lake-related commercial activity, and maintenance of such

levels would have continued detrimental effects on property values, the tax base and the local economy. The DNR objected to admitting this evidence at the hearing, and the ALJ sustained the objection by striking the experts' testimony and supporting exhibits from the record. The ALJ concluded that "[s]econdary or indirect economic impacts of a water level determination do not bear on the statutory standard set forth in section 31.02(1)," citing *Wisconsin's Environmental Decade, Inc. v. DNR*, 115 Wis. 2d 381, 340 N.W.2d 722 (1983). While declining to consider economic losses associated with lower water levels, the ALJ took into account riparian owners' diminished ease of access to the lake waters, which, the ALJ explained, resulted in the "diminished utility [of these riparian rights] and enjoyment of their property," and "doubtless reduces the value of that property to them."

¶ 28. Balancing competing public interests in navigable waters under Wis. Stat. § 31.02(1), the ALJ concluded that the great weight of the hearing evidence supported the DNR's initial order denying the District's petition. The ALJ concluded the decision to maintain the summer water levels in the 1991 DNR order and to slightly moderate the winter drawdown levels were "in the interest of public rights in navigable waters" and consistent with the DNR's duty "to promote safety and protect life, health and property." The ALJ concluded the evidence "establishes that increasing lake levels to a year round target of 776.80 would have profound and lasting negative effects on much of the property and ecological resources abutting the lake and its tributaries." "[T]he positive ecological benefits from the proposed increased water levels are slight in comparison to the profound substantial negative effects."

¶ 29. By contrast, improvements in navigability and access to Lake Koshkonong would be "modest" under the proposed increased water levels. "[E]nhancement to access and navigation from increased water levels would be far outweighed by the substantial negative environmental impacts caused by the higher water."

¶ 30. Finally, the ALJ's order addressed the District's objection that the DNR's initial order showed an unfair bias in favor of wetland preservation:

> The [District] argue[s], in effect, that the DNR's rejection of higher water levels was preordained in part by an institutional bias (and, in the case of some individual staff members, personal biases) in favor of wetland preservation, without due regard to other interests in navigable waters. The DNR evaluated the proposed water level increase against the appropriate regulatory standards, including chapter NR 103, Wis. Admin. Code., with a critical eye, but with objectivity and fairness. The evidence fails to establish that the exercise of the DNR's discretion under WIS. STAT. § 31.02 was infected by bias or prejudice, or that the DNR did not give due consideration to all relevant factors and interests.

The ALJ thus sustained the DNR's initial order maintaining the summer water levels in the 1991 DNR order, and raising the winter drawdown level by six inches.

### III.   Standard of Review

¶ 31. On an appeal of a circuit court's order reviewing an agency decision, we review the decision of the agency, not the circuit court. *Froebel v. DNR*, 217 Wis. 2d 652, 662, 579 N.W.2d 774 (Ct. App. 1998). In this case we are reviewing the DNR's interpretation and application of WIS. STAT. § 31.02(1).

¶ 32. Statutory interpretation is a question of law subject to de novo review and courts are not bound by an agency's interpretation. *Harnischfeger Corp. v. LIRC*, 196 Wis. 2d 650, 659, 539 N.W.2d 98 (1995). Nonetheless, we generally accord varying degrees of deference to an administrative agency's construction of a statute to correspond with the agency's expertise and with the legislature's charge to that agency to administer the statute. *See Racine Harley-Davidson, Inc. v. State*, 2006 WI 86, ¶ 14, 292 Wis. 2d 549, 717 N.W.2d 184. There are three levels of deference courts accord an administrative agency's decision: great weight, due weight and no weight. *See State v. Schwarz*, 2005 WI 34, ¶ 15, 279 Wis. 2d 223, 693 N.W.2d 703.

¶ 33. The parties dispute the appropriate level of deference we should apply to the DNR's interpretation and application of WIS. STAT. § 31.02(1). However, we need not decide which level of deference is appropriate. Even applying de novo review, we conclude WIS. STAT. § 31.02(1) does not require the DNR to consider the economic effects proposed water levels have on residential property values, business incomes and tax revenues; the DNR is permitted to consider impacts its water level order has on wetlands adjacent to navigable waters; and the DNR did not exceed the scope of its authority by applying water quality standards set forth in WIS. ADMIN. CODE § NR 103 in making its water level order.

## IV. Principles of Statutory Interpretation

¶ 34. Statutory interpretation begins with the statute's text; we give the text its common, ordinary, and accepted meaning, except that we give technical or specially defined words their technical or special defi-

nitions. *State ex rel. Kalal v. Circuit Court for Dane Cnty.*, 2004 WI 58, ¶ 45, 271 Wis. 2d 633, 681 N.W.2d 110. We interpret statutory language in the context within which it is used, "not in isolation but as part of a whole; in relation to the language of surrounding or closely-related statutes; and reasonably, to avoid absurd or unreasonable results." *Id.*, ¶ 46. In construing a statute we are to give deference to the policy choices made by the legislature in enacting the law. *Id.*, ¶ 44. We also consider the scope, context and structure of the statute itself. *Id.*, ¶¶ 46, 48. If this process of analysis yields a plain meaning, then there is no ambiguity and we apply that plain meaning. *Id.*, ¶ 46.

## V. Discussion

¶ 35. WISCONSIN STAT. § 31.02(1) grants the DNR the power to "regulate and control the level and flow of water in all navigable waters" "in the interest of public rights in navigable waters or to promote safety and protect life, health and property." This power includes the authority to set "the maximum level of water that may be impounded and the lowest level of water that may be maintained by any dam . . . which will affect the level and flow of navigable waters." Section 31.02(1). The disputes in this case center on the factors the DNR may or may not consider in discharging its duties under § 31.02(1).

### A. Consideration of Impacts of Water Levels on Residential Property Values, Business Incomes and Local Tax Revenues under WIS. STAT. § 31.02(1)

¶ 36. WISCONSIN STAT. § 31.02(1) sets forth two separate bases for the DNR's authority to set water levels in navigable waterways: "the interest of public

rights in navigable waters" and "to promote safety and protect life, health and property." The first issue we address in this case concerns the DNR's duty to "protect . . . property" in setting water levels for Lake Koshkonong.

¶ 37.   The District argues that "protect . . . property" in Wis. Stat. § 31.02(1) should be broadly construed to require the DNR to take into account the economic effect proposed water levels will have on residential property values, business incomes and local tax revenues. The District asserts that "economic value is the only objective basis to determine whether or not, or to what extent, a water level order 'protects property.' " The DNR responds that it properly interpreted "protect . . . property" in § 31.02(1) as being limited to considering direct hydrologic impacts to real property from excessive or insufficient water, and impacts on the use and enjoyment rights of riparian owners.

¶ 38.   Wisconsin Stat. ch. 31 does not define "property" or "protect . . . property," or otherwise explicitly clarify the scope of the provision. In addition, no case in Wisconsin defines the scope of the DNR's responsibilities to "protect . . . property" under Wis. Stat. § 31.02(1). Thus, we turn first to the commonly understood meanings of the words "protect and "property" as provided in an approved dictionary. *See Xerox Corp. v. DOR*, 2009 WI App 113, ¶ 61, 321 Wis. 2d 181, 772 N.W.2d 677 (in the absence of a statutory definition of a term, we may resort to a dictionary definition to discern the legislature's intent.).

¶ 39.   The DNR notes a commonly accepted meaning of "protect" is "[to] keep from harm, attack, or injury," The American Heritage Dictionary, Second College Edition, 995 (1985), and suggests that this definition argues for a limited interpretation of "protect . . .

694

property." In our view, this definition only begs the question: Keep *what* from harm, attack or injury? Riparian owners' physical property and rights of use and enjoyment only, as the DNR maintains, or residential property values, business incomes and tax revenues as well, as the District argues? Likewise, standard dictionaries are of little assistance in determining whether the legislature intended a narrow or a broad definition of "property" here. *See* WEBSTER'S II.NEW COLLEGE DICTIONARY 887 (1999) (defining property as "1. Ownership. 2.a. A possession. b. Possessions as a whole. 3. Something tangible or intangible to which its owner holds legal title.").

¶ 40. Having determined the scope of "protect . . . property" cannot be ascertained by use of a dictionary, we examine other statutes similar in function to WIS. STAT. § 31.02(1).

¶ 41. As the DNR observes, WIS. STAT. § 31.02(1) is one of many statutes that identify the factors the DNR may take into account when making decisions affecting the environment. Comparing § 31.02(1) to these related statutes, the DNR contends that, when the legislature intends the DNR to consider property values or other similar economic impacts in its decision-making, it does so explicitly. We agree.

¶ 42. For example, the statute authorizing the DNR to grant a permit to change the course of a stream requires it to consider whether the proposed change "will improve the economic or aesthetic value of the applicant's land." WIS. STAT. § 30.195(2)(c)2. Another statute, WIS. STAT. § 285.01(12), requires the DNR to take "into account energy, economic and environmental impacts and other costs" when determining whether a particular air pollution control option is the "best available control technology." WISCONSIN STAT. § 31.06(3)(b)

provides that the DNR may grant a permit for the construction, maintenance or operation of a proposed dam if the applicant meets certain criteria and the proposal is "in the public interest, considering ecological, aesthetic, economic and recreational values." These statutes show that, when the legislature wants the DNR to take into account property values and other economic effects in its decision-making, it does so in clear, unambiguous language.

¶ 43.  We are further persuaded that "protect . . . property" in WIS. STAT. § 31.02(1) does not include property values and similar economic factors in setting navigable water levels because, as the DNR argues, such an interpretation would have no logical stopping point. For example, it is unclear under the District's construction whether the DNR's consideration of economic effects on real property would be limited to property values of riparian owners or would also include the values of adjacent or area properties not situated directly on the lake. Similarly, if the DNR were required to consider revenues of businesses directly linked to lake recreational activities, like marinas and bait shops, would it also be required to consider revenues of businesses with less direct links to use of navigable waters, such as gas stations and convenience stores? The District's interpretation provides no basis for excluding consideration of economic impacts that may be too attenuated to reliably quantify.

¶ 44.  Finally, the supreme court's interpretation of similar statutory language in the former WIS. STAT. § 31.06 (1935) is instructive. This statute mandated the granting of a permit to construct a dam so long as the proposed dam did not "materially obstruct existing navigation or violate other public rights and will not endanger life, health or property." In *City of Lisbon v Harebo*, 224 Wis. 66, 73, 271 N.W. 659 (1937), the

supreme court concluded that a dam would not "endanger . . . property" if injury to property resulting from "normal flowage by the ordinary operation of the dam" were likely to occur, "since this is the inevitable consequence of building and maintaining a dam." Rather, endangerment to property would occur if the proposed dam "by reason of its location, or manner of construction, or the character of the soil upon which it is built . . . it [would] tend to flood cities or villages or [would be] likely to give way and create havoc and destruction below the dam . . . ." *Id.*

¶ 45.   The *Harebo* court's limited construction of "endanger[ments to] . . . property" to mean injuries caused by flooding, and its conclusion that regular operation of a dam would not "endanger . . . property," supports a similarly limited construction of "protect property" in WIS. STAT. § 31.02. *Harebo* suggests that "protect[tion of] property" is, as the DNR maintains, limited to protection of real property from hydrologic events like flooding and does not include protection of property values, business incomes and tax revenues resulting from the setting of water levels.

██

¶ 46.   For these reasons, we conclude that the requirement in WIS. STAT. § 30.12(1) that the DNR "protect . . . property" plainly does not require the DNR to take into account the economic effect that proposed water levels may have on residential property values, business income and tax revenues. Therefore, the ALJ properly struck this evidence from the record.

¶ 47.   The District argues that an interpretation of WIS. STAT. § 30.12(1) that excludes consideration of property values and similar economic interests is contrary to two early administrative decisions interpreting the statute; to the legislative history of the Water Powers

Acts, which included § 30.12(1); and to the DNR's own guidance set forth in its Waterway and Wetland Handbook.[2] However, because we give no deference to the DNR's interpretation of § 31.02(1) and have concluded that the statute is unambiguous, we need not address the agency's administrative decisions and materials or consider extrinsic sources of interpretation, such as legislative history. *See Kalal*, 271 Wis. 2d 633, ¶ 46.

¶ 48.  In summary, we conclude that the DNR is not required to consider the potential economic effects on residential property values, business income and tax revenues when setting water levels in navigable waters under WIS. STAT. § 31.02(1).

## B.  Consideration of Impacts of Water Levels on Adjacent Private Wetlands Located Above the Ordinary High Water Mark

¶ 49.  The District contends the DNR exceeded its authority by considering impacts on adjacent wetlands

[2] The District also contends that the early supreme court decision *Smith v. Youmans*, 96 Wis. 103, 70 N.W. 1115 (1897), in which a group of riparian property owners were held to have acquired a prescriptive right to the maintenance of a certain water level on a lake, demonstrates an early recognition by the court that "the raising of a dam substantially alters economic activity organized around the affected water body." Regardless whether *Youmans* may be read to stand for this principle, *Youmans* predates the statute at issue in this case.

Further, the District argues that the DNR "implicitly acknowledged that economic value is the yardstick by which the protection of property is measured" by introducing testimony as to the economic value of board-feet of green ash trees that would be lost to flooding if the District's proposed water level were adopted. However, as the DNR points out, the ALJ did not factor in the economic value of the loss of the trees when applying the "protect . . . property" standard.

located above the ordinary high water mark in considering the public interest in navigable waters under Wis. Stat. § 31.02(1). According to the District, the extent of the DNR's jurisdiction in considering "the public interest in navigable waters" extends only to lands underlying lakes and streams located below the ordinary high water mark. Consequently, according to the District, wetlands situated above the ordinary high water mark fall outside the bounds of "public rights in navigable waters" and therefore fall outside the scope of the public interests the DNR is authorized to consider under § 31.02(1). Applying that theory to the undisputed facts of this case, the District argues that the DNR exceeded the scope of its authority by considering the potential impact of proposed water levels on Lake Koshkonong on private wetlands sitting above the ordinary high water mark.[3] We disagree.

¶ 50.   The scope of an agency's authority to act is a question of law, which we review de novo. *Town of Barton v. Division of Hearings & Appeals*, 2002 WI App 169, ¶ 6, 256 Wis. 2d 628, 649 N.W.2d 293 (citation omitted).

¶ 51.   It is well-established that the public rights protected under the public trust doctrine do not stop at

---

[3] We observe that the District's argument that the DNR's jurisdiction terminates at the ordinary high water mark appears to conflict with its argument that the DNR was required to consider the economic effects of water levels set under Wis. Stat. § 31.02(1). The economic impacts the District complains of and argues that the DNR should consider in setting water levels are to properties that likely sit above the ordinary high water mark. The District does not attempt to reconcile the apparent conflict between these two arguments.

the edge of the beds of navigable waters. In *Just*, the seminal public trust case, the Wisconsin Supreme Court recognized

> the interrelationship of the wetlands, the swamps and the natural environment of shorelands to the purity of the water and to such natural resources as navigation, fishing, and scenic beauty . . . . [S]wamps and wetlands serve a vital role in nature, are part of the balance of nature and are essential to the purity of the water in our lakes and streams.

*Just v. Marinette Cnty.*, 56 Wis. 2d, 7, 16–17, 201 N.W.2d 761 (1972). The *Just* court noted that the wetlands in that case, as here, were not an "isolated swamp unrelated to a navigable lake or stream, the change of which would cause no harm to public rights. Lands adjacent to or near navigable waters exist in a special relationship to the state," declared the court, and "*are subject to the state public trust powers.*" *Id.* at 18–19 (emphasis added).

¶ 52. The *Just* court's discussion of lands adjacent to or near navigable waters did not distinguish between those lying below the ordinary high water mark, and those lying above this mark. While it is the existence of navigable water that triggers the DNR's jurisdiction under WIS. STAT. § 31.02(1) and the public trust doctrine, *see State v. Trudeau*, 139 Wis. 2d 91, 102, 408 N.W.2d 337 (1987), *Just* establishes that the DNR is not restricted to consideration of impacts below the ordinary high water mark when evaluating public rights in navigable waters. Notably, the District does not contend that an analysis of "the interest of public rights in navigable waters" under § 31.02(1) should differ from any other public rights analysis under the statute at issue in *Just*, the navigable waters protection law, WIS. STAT. § 144.26 (1967), renumbered WIS. STAT. § 281.31.

¶ 53.  Further, the District's interpretation is unreasonable because it would require the DNR to ignore potential adverse impacts of its own actions on the very resources it has been assigned to protect. As noted, the DNR is charged with protecting, maintaining and improving the "quality . . . of the waters of the state, ground and surface, public and private." WIS. STAT. § 281.11. Under the District's interpretation of WIS. STAT. § 31.02(1), the DNR could not take into account its duty to protect water quality in all waters of the state even if a water level determination under § 31.02(1) adversely affected water quality in wetlands adjacent to the navigable water body. Moreover, using the ordinary high water mark to determine the scope of a public rights analysis would artificially divide otherwise contiguous wetlands that are a part of the same ecological system, excluding from consideration pockets of wetlands that are similar in character and provide similar public benefits to those wetlands included in the public rights analysis. *Cf. M&I Marshall & Ilsley Bank v. Town of Somers*, 141 Wis. 2d 271, 288, 414 N.W.2d 824 (1987) ("[A] parcel of land which consists of continuing wetland which is partly within and partly outside a shoreland area should be treated as if the entire wetland was located within a shoreland area.").

■■■

¶ 54.  Accordingly, we conclude the DNR may consider impacts to lands, including privately-held wetlands, adjacent to or near navigable waters when regulating water levels in the interest of public rights under WIS. STAT. § 31.02(1), and that the DNR did not exceed

the scope of its authority in considering such impacts when setting water levels for Lake Koshkonong.[4]

## C. Reference to Water Quality Standards of § NR 103

██

¶ 55.  The District contends the DNR exceeded the scope of its authority by applying the wetland water quality standards of WIS. ADMIN. CODE § NR 103 in setting water levels in Lake Koshkonong. Section NR 103 was adopted pursuant to WIS. STAT. § 281.15(2)(b), which authorizes the DNR to adopt rules setting wetland water quality standards. WISCONSIN STAT. § 281.92 states:  "Nothing in this chapter affects ss. 196.01 to 196.79 or ch. 31." The District argues this provision prohibits the DNR from considering § NR 103 wetland water quality standards in setting a water level under WIS. STAT. § 31.02(1). We disagree, and conclude under a plain meaning interpretation of the statutes that § 281.92 does not restrict DNR's consideration of wet-

---

[4] Even assuming the District's argument had merit, the District makes no attempt to show which adjacent, privately-held wetlands were plainly above the ordinary high water mark, and how the ALJ's decision might have been different had the impacts on these wetlands been excluded from consideration. The DNR argues that, because the District sought to exclude from consideration impacts to wetlands above the ordinary high water mark, it was their burden to locate these wetlands, and they failed to do so. The District's reply brief does not respond to this argument, and we take its silence as a concession. *See United Co-op v. Frontier FS Co-op*, 2007 WI App 197, ¶ 39, 304 Wis. 2d 750, 738 N.W.2d 578 (appellant's failure to respond in reply brief to an argument made in response brief may be taken as a concession).

land quality standards derived from ch. 281, including WIS. ADMIN. CODE § NR 103, when setting water levels under § 31.02(1).

¶ 56. The District's interpretation of WIS. STAT. § 281.92 would prevent the agency charged with protecting wetland water quality from considering the statutes and rules related to wetland water quality when setting water levels under WIS. STAT. § 31.02(1). The DNR would be forced to ignore its various responsibilities under these statutes and rules, as well as the public trust doctrine, when setting levels in navigable waters. Because this would be an absurd result, we reject the District's interpretation of § 281.92. *See Watton v. Hegerty*, 2008 WI 74, ¶ 26, 311 Wis. 2d 52, 751 N.W.2d 369 (statutes are interpreted to avoid absurd results).

¶ 57. Rather, we interpret WIS. STAT. § 281.92 to mean that nothing in the DNR's water protection responsibilities under ch. 281 and the associated administrative rules expands or restricts its responsibilities to set water levels under WIS. STAT. § 31.02(1). We conclude that § 281.92 does not preclude the DNR from referencing the wetland water quality standards of WIS. ADMIN. CODE § NR 103 or any part of ch. 281 when setting water levels under § 31.02(1). Such an interpretation is necessary to reconcile the DNR's various responsibilities under chs. 31 and 281 and to harmonize the statutes and regulations at issue. *See Jones v. State*, 226 Wis. 2d 565, 576, 594 N.W.2d 738 (1999) (statutes are to be harmonized when they can reasonably be construed to avoid a conflict).

¶ 58. A brief review of the statutory history of relevant portions of WIS. STAT. chs. 281 and 31 illustrates that WIS. STAT. § 281.92 is the product of an earlier era when water quality protection and regula-

tion of navigable water levels were responsibilities assigned to separate agencies. *See County of Dane v. LIRC*, 2009 WI 9, ¶ 27, 315 Wis. 2d 293, 759 N.W.2d 571; *Richards v. Badger Mut. Ins. Co.*, 2008 WI 52, ¶ 22, 309 Wis. 2d 541, 749 N.W.2d 581 (statutory history may be considered as a part of a plain meaning analysis of a statute).

¶ 59.  In 1915, the state Railroad Commission was granted the authority under § 1596–2.1 (1915) of the Wisconsin Statutes to regulate and control the level and flow of water in navigable waters "in the interest of public rights in navigable waters or to promote safety and protect life, health and property." Section 1596–2.1 (1915) was renumbered § 31.02 in 1917. In 1919, the state Board of Health was granted the authority to "supervis[e] and control . . . water and ice supplies, water purification, sewage and refuse treatment and disposal and the pollution of streams." 1919 Wis. Laws, ch. 447. At this time, the first version of WIS. STAT. § 281.92, then numbered § 1407m-1(12) (1919), was enacted, providing: "Nothing in this act shall be construed to alter, amend, repeal, impair or affect any of the provisions of . . . chapter 31 of the Wisconsin statutes."[5] *Id.* at § 2.

¶ 60.  This statutory history shows that WIS. STAT. § 281.92 was originally adopted to demarcate the regulatory spheres of influence of the state Board of Health and the Railroad Commission; the Board of Health's water purification and water pollution prevention re-

---

[5] Section 1407m-1(12) was later renumbered WIS. STAT. § 144.12 (1923) and amended to provide: "Nothing in this chapter shall be construed to affect . . . chapter 31 of the statutes." The section was renumbered WIS. STAT. § 144.27 in 1979, *see* 1979 Wis. Laws, ch. 221, § 624, and finally renumbered § 281.92 in 1995. *See* 1995 Wis. Act 227, § 435.

704

sponsibilities were not to affect the authority of the Railroad Commission in dam regulation under WIS. STAT. ch. 31, and the Railroad Commission's responsibilities were not to affect the authority of the Board of Health in its sphere of regulation. Because these two areas of regulatory responsibility are now both under the DNR's administration, the expansive reading of § 281.92 proposed by the District makes little sense today. [6]

## VI. Conclusion

¶ 61.   In sum, we conclude that: (1) the DNR is not required under WIS. STAT. § 31.02(1), as part of its responsibility to "protect life, health and *property*" in regulating and controlling water levels and flow, to consider the potential economic effects on residential property values, business income and tax revenue from proposed water levels; (2) the DNR did not exceed the scope of its authority when it considered the effect setting water levels under § 31.02(1) may have on adjacent wetlands; and (3) the DNR did not exceed the scope of its authority in considering the wetland water quality standards of WIS. ADMIN. CODE § NR 103, and other standards originating from ch. 281 of the Wiscon-

---

[6] At several points in its briefs, the District criticizes the DNR for placing undue emphasis on wetland protection and water preservation in issuing its decision. To the extent these criticisms may be taken as an argument that the DNR favored wetland protection and water preservation over other factors in setting water levels, we defer to the DNR's balancing of the public interests at issue. *See Hixon v. PSC*, 32 Wis. 2d 608, 620, 629, 146 N.W.2d 577 (1966) (weighing of relevant factors is a policy function that has been delegated to the agency by the legislature in case denying permit to maintain a breakwater in navigable waters).

sin Statutes, in setting the water levels for Lake Kosh-konong. Accordingly, we affirm the circuit court order affirming the DNR's order.

*By the Court.*—Order affirmed.