DIANA SHOOTING CLUB. Appellant, vs. HUSTING, Respond-
ent.

*February 6—February 24, 1914.*

*Navigable waters: Rights of the public and of riparian owners:
Hunting: Extent of right: High-water mark.*

1. Navigable waters in this state are public waters, and the policy
   which, in the ordinance of 1787, in the enabling act of 1846,
   and in the state constitution, reserved to the people the full
   and free use of public waters should not be limited or curtailed
   by narrow construction but should be interpreted in the broad
   and beneficent spirit that gave rise to it.
2. Riparian owners on navigable streams in this state have only a
   qualified title to the beds of such streams, which title is en-
   tirely subordinated to, and not inconsistent with, the right of
   the state to secure and preserve to the people the full enjoy-
   ment of navigation and the rights incident thereto.
3. The right of the public to hunt on the navigable streams of this
   state is, like the right to fish in such streams, an incident of
   the right of navigation.
4. Hunting on navigable waters is lawful when it is confined
   strictly to such waters while they are in a navigable stage,
   and between the boundaries of ordinary high-water marks; and
   when so confined it is immaterial what the character of the
   stream or water is, whether deep or shallow, clear or covered
   with aquatic vegetation.
5. By ordinary high-water mark is meant the point on the bank
   or shore up to which the presence and action of the water is so
   continuous as to leave a distinct mark either by erosion, de-
   struction of terrestrial vegetation, or other easily recognized
   characteristic.
6. Where the bank or shore at any particular place is of such a
   character that it is impossible or difficult to ascertain where
   the point of ordinary high-water mark is, recourse may be had
   to other places on the bank or shore of the same stream or
   lake to determine whether a given stage of water is above or
   below ordinary high-water mark.
[7. Whether the public has a right to hunt between ordinary high-
   water marks on a navigable stream which, owing to a low
   stage of water, is unnavigable, or on land between such marks
   which has become dry or exposed, not decided.]

APPEAL from a judgment of the circuit court for Dodge county: MARTIN L. LUECK, Circuit Judge. *Affirmed.*

Action of trespass. The complaint alleges the incorporation of the plaintiff; that on the 24th day of September, 1911, it was lawfully in possession of section 19 in the town of Williamstown, Dodge county, Wisconsin, and was the owner of the exclusive right and title to the hunting and shooting privileges upon said section. It then charges that the defendant unlawfully broke and entered upon the same, trod down and injured the grass, rushes, wild rice, and herbage growing thereon, and disturbed the plaintiff in the use and occupation of its land and interfered with its exclusive right to hunt and shoot thereon, to its damage in the sum of $50. The answer denied that the defendant broke or entered upon the premises of plaintiff or hunted upon its land or in any way disturbed its possession or right of enjoyment thereto, and alleged that defendant hunted only upon the public navigable waters of the state; that he was a resident thereof and in possession of a license duly issued which entitled him to hunt where he did.

The trial court found these facts: The defendant at the time of the alleged trespass was a resident and citizen of this state, in possession of a valid hunting license. On September 24, 1911, without trespassing upon the lands of the plaintiff, he entered his hunting boat floating upon the waters of Rock river and with the aid of pole and paddle propelled it down the river to the place of the alleged trespass, and there, for the purpose of shooting wild ducks flying over the place, he pushed it into a growth of vegetation known as "flag" which grew from the bottom of the water to a height of from four to five feet above the surface. The place of the alleged trespass was within the area of what is known as Malzahn's Bay, which is a widening of the river and is about one-half mile wide and about five eighths of a mile long. The bay has well defined shores or banks and is surrounded

on all sides, with the exception of the channels through which the water passes, with what are called hard bog, which may be traveled afoot without a person walking thereon sinking in. During the months of March to June, inclusive, in each year, at time of ordinary high water, the water over this entire area, from hard bog or shore, is from one to two feet in depth. During the summer months and fall this depth gradually decreases to from eight to twelve inches. In times of low water, for a distance of several rods out from the hard bog or shore, the water recedes from the surface altogether, leaving a rim of mud exposed. Such exposed rim, called soft or mud bog, at such times is unnavigable by boat and cannot be traveled upon by foot without a person so attempting to walk thereon sinking to his knees or hips. During the spring and summer months, up to and including the month of June, each year, the waters of Malzahn's Bay are, and have for thirty-five years at least been, navigable in fact from hard bog to hard bog over its entire area, and have during all such time in each year been navigated generally by the public with rowboats. During the period ending in June of each year the place of the alleged trespass is covered with water in common with the remaining area of Malzahn's Bay, and during all of the time within the last thirty-five years has been navigable and navigated the same as, and as a part of, said Malzahn's Bay, and during such period said place has not been distinguishable in appearance from any other part of the bay. After the month of June in each year, vegetation, consisting of wild rice, bulrushes, water lilies, and flag, take root below the surface of the water in the soft muck of the bottom and grow above the surface to a height of from four to five feet, forming blinds or cover in which hunters conceal themselves from view of the ducks flying over. The flag extended west and north from where the trespass is alleged to have occurred for a distance of about ten to twelve rods to what is known as the old river bed, which is between two to

three rods in width, and during the periods of each year ending in June is navigable in fact and has always been in fact navigated with the remaining area of Malzahn's Bay. Later in the year, in times of low water, the water recedes, sometimes leaving the bottom of the old river bed exposed and sometimes leaving it with a shallow covering of water. At such times the river bed is dotted with sparsely growing aquatic vegetation, such as rushes, rice, and flag. Up to and including the month of June each year the place of the alleged trespass is separated from the hard bog or shore by such strip of water. To the west and north of said old river bed again occurs a growth of flag and rushes which continues to the west and north of the hard bog or shore of the bay. At the time and place in question the water below the boat of the defendant was about twelve inches deep, and his boat was floating upon the water. The water to the west and north of his boat gradually decreased in depth as it neared the hard bog or shore, finally ending a number of rods from the hard bog or shore, leaving the bottom of the bay exposed. In all other directions the place of the alleged trespass was surrounded by open water free from vegetation to the line of vegetation upon the opposite shore of the bay, and all of said open water, including that part of the bay covered by aquatic vegetation until the so-called mud or soft bog was reached, was navigable in fact at all periods of the year, except when frozen over. At about the place in question the waters of the bay began to narrow down to what is known as Skirmish Line, which lies upon the usual route of travel from points north and east to points west and south, and the place of the alleged trespass was during the period ending in June of each year within the route of such travel. Rock river, including Malzahn's Bay, has been in fact, for more than thirty-five years prior to the 24th of September, 1911, a natural, navigable river and body of water and was in fact navigated by the public generally by skiffs and rowboats during all of said time.

At the time of the alleged trespass the plaintiff had a valid subsisting lease of certain land abutting on Rock river, and the bed of the river, including Malzahn's Bay at the point of the alleged trespass, was embraced within the descriptions of premises covered by said lease, which in its terms purported to give to the plaintiff exclusive hunting privileges upon the premises owned by the lessors and covered by the lease.

As conclusions of law the court found (1) that plaintiff at the time in question had no vested right to use the place of the alleged trespass to the exclusion of the public; (2) that the defendant was lawfully exercising the right to hunt at said place and did not trespass upon the lands of the plaintiff and did not in any manner interfere with plaintiff's rights; and (3) that judgment should be entered dismissing the complaint upon the merits.

From a judgment entered accordingly the plaintiff appealed.

For the appellant there was a brief by *Doe & Ballhorn,* and oral argument by *J. B. Doe.* They contended, *inter alia,* that the right of navigation or to use a river as a highway does not carry with it the right to conceal one's self in the vegetation belonging to and growing on the property of another, for the purpose of shooting wild ducks, and the doing so and actually shooting such ducks constitutes trespass upon the rights of the owner of the soil under the water and of the vegetation growing through and above such water. Defendant's right upon the navigable portions of Rock river consists of nothing more than a right to pass to and fro over the open waters of such portions of said river, and he had no right to leave the open part of the stream or to push into the vegetation belonging to and in the exclusive possession of the plaintiff, or to stop or hide on plaintiff's premises for the purpose of hunting or to shoot ducks passing over plaintiff's premises. The exclusive right to do such acts was vested in the plaintiff by its lease; that is, in the owner of the soil. They cited *Bristow v. Cormican,* L. R. 3 App. Cas. 641; Gould, Waters

(3d ed.) § 81; 2 Farnham, Waters & Water Rights, sec. 398; *State v. Roberts,* 59 N. H. 256; *Percy S. Club v. Astle,* 145 Fed. 60; *Duncan v. Sylvester,* 24 Me. 482; *Schulte v. Warren,* 218 Ill. 108, 75 N. E. 783; *Willow River Club v. Wade,* 100 Wis. 86, 76 N. W. 273; *Diana S. Club v. Lamoreux,* 114 Wis. 44, 89 N. W. 880; *Whittaker v. Stangvick,* 100 Minn. 386, 111 N. W. 295; *L. Realty Co. v. Johnson,* 92 Minn. 363, 100 N. W. 94, 66 L. R. A. 439; *Sterling v. Jackson,* 69 Mich. 488, 37 N. W. 845.

For the respondent there was a brief by *Husting & Brother,* and oral argument by *Paul O. Husting.* To the point that in this state the riparian owner of land abutting on a navigable stream takes and holds his title to the bed of such stream between the lines of ordinary high-water mark, in trust for and subject to the rights of the public for the purpose of navigation, hunting, fishing, and other like public purposes, they cited *Willow River Club v. Wade,* 100 Wis. 86, 76 N. W. 273; *Ne-pee-nauk Club v. Wilson,* 96 Wis. 290, 71 N. W. 661; *Priewe v. Wis. S. L. & I. Co.* 103 Wis. 537, 79 N. W. 780; *Pewaukee v. Savoy,* 103 Wis. 271, 79 N. W. 436; *Diana S. Club v. Lamoreux,* 114 Wis. 44, 54, 89 N. W. 880; *Ill. S. Co. v. Bilot,* 109 Wis. 418, 84 N. W. 855, 85 N. W. 402; *Franzini v. Layland,* 120 Wis. 72, 81, 97 N. W. 499; *In re Horicon D. Dist.* 136 Wis. 227, 234–237, 116 N. W. 12. As to how the high-water mark is to be determined, they cited *Carpenter v. Hennepin Co.* 56 Minn. 513, 58 N. W. 295; *Welch v. Browning,* 115 Iowa, 690, 87 N. W. 430; 15 Am. & Eng. Ency. of Law (2d ed.) 342; *Howard v. Ingersoll,* 13 How. 381, 427, 428.

VINJE, J. The ordinance of 1787 establishing the government of the Northwest territory of which Wisconsin formed a part, provided that "The navigable waters leading into the Mississippi and St. Lawrence, and the carrying places between the same, shall be common highways, and for-

ever free, as well to the inhabitants of the said territory, as to the citizens of the United States, and those of any other states that may be admitted into the confederacy, without any tax, impost, or duty therefor." The act of April 20, 1836, establishing the territorial government of Wisconsin, provided in sec. 12 thereof that the inhabitants of the territory should be subject to all the conditions and restrictions and prohibitions contained in the ordinance of 1787. The act of August 6, 1846, enabling the people of Wisconsin territory to form a state, declared that "the said state of Wisconsin shall have concurrent jurisdiction on the Mississippi and all other rivers and waters bordering on the said state of Wisconsin, so far as the same shall form a common boundary to said state and any other state or states now or hereafter to be formed or bounded by the same; and said river and waters, and the navigable waters leading into the same, shall be common highways and forever free, as well to the inhabitants of said state as to all other citizens of the United States, without any tax, duty, impost or toll therefor." Sec. 1, art. IX, of our constitution provides that "the river Mississippi and the navigable waters leading into the Mississippi and St. Lawrence, and the carrying places between the same, shall be common highways and forever free, as well to the inhabitants of the state as to the citizens of the United States, without any tax, impost or duty therefor."

It will thus be seen that ever since the organization of the Northwest territory in 1787 to the time of the adoption of our constitution the right to the free use of the navigable waters of the state has been jealously reserved not only to citizens of the territory and state but to all citizens of the United States alike. All that part of Rock river as far north as the northern boundary of Dodge county is by sec. 1607, Stats. 1913, declared navigable, and the court found it, as well as the *locus in quo,* to be so in fact, at the time the alleged trespass was committed. The case therefore presents the ques-

tion whether the right to hunt on navigable waters of the state is reserved to the residents thereof where the title to the land covered by such waters is in private parties. At common law the rights of hunting and of fishing were held to be incident to the right of navigation. In England, however, only waters on which the tide ebbed and flowed were held navigable. Such limitation upon navigable waters has never obtained in the United States. Navigability in fact for products of the forest, field, or commerce for regularly recurrent annual periods has, in our state, been held sufficient to constitute a stream navigable. *Olson v. Merrill,* 42 Wis. 203; *Weatherby v. Meiklejohn,* 56 Wis. 73, 76, 13 N. W. 697; *A. C. Conn Co. v. Little Suamico L. M. Co.* 74 Wis. 652, 655, 43 N. W. 660; *Falls Mfg. Co. v. Oconto River Imp. Co.* 87 Wis. 134, 58 N. W. 257; *Bloomer v. Bloomer,* 128 Wis. 297, 311, 107 N. W. 974.

In some of the states embraced within the Northwest territory the title to the bed of navigable streams remained in the state. In Wisconsin it is held to be in the riparian owners. So far as the right of navigation, and the rights incident thereto, are concerned, it is entirely immaterial who holds the title, the state or the riparian owners. Such title is equally subject to the rights mentioned. It is beyond the power of the state to alienate it freed from such rights. *Priewe v. Wis. S. L. & I. Co.* 103 Wis. 537, 550, 79 N. W. 780, and cases cited; *People v. New York & S. I. F. Co.* 68 N. Y. 71; 1 Farnham, Waters & Water Rights, sec. 36a. Speaking of this difference in the law of the several states as to who owns the title to the bed of navigable streams, the supreme court of the United States in *Hardin v. Jordan,* 140 U. S. 371, 383, 11 Sup. Ct. 808, 838, says:

"In the one case, the state, by its general law, does not allow the grant to inure to the individual farther than to the water's edge, reserving to itself the ownership and control of the river bed; in the other cases, the states allow the full common-law effect of the grant to inure to the grantee, reserving

to themselves only those rights of eminent domain over the waters and the land covered thereby which are inseparable from sovereignty."

It would no doubt have been more logical to hold, as English courts do, that private ownership ends where navigability begins, but there is nothing inconsistent in the doctrine of private ownership of beds of navigable streams subject to all the burdens of navigation and the incidents thereof. As long as the state secures to the people all the rights they would be entitled to if it owned the beds of navigable rivers, it fulfils the trust imposed upon it by the organic law which declares that all navigable waters shall be forever free. As was pointed out in *Willow River Club v. Wade,* 100 Wis. 86, 76 N. W. 273, riparian owners on navigable streams have only a qualified title to the beds thereof, which title is entirely subordinated to, and not inconsistent with, the rights of the state to secure and preserve to the people the full enjoyment of navigation and the rights incident thereto.

The same case also clearly establishes the right of the public to fish in all the navigable waters of the state, holding as it does that the right of navigation carries with it the right of fishing, which is incident to the right to navigate. The same process of reasoning applies to the right to hunt on navigable waters as an incident to the right of navigation. No difference in principle is perceived. Indeed, if there is any force at all in assuming that there is no relation between the title to the bed of a navigable stream and the fish in the waters above it, there would seem to be less relation between game and the title to such bed. However, neither the right to fish nor to hunt need be grounded on the absence or presence of such a relation. It is perfectly logical and consistent to extend to our navigable waters such rights as were by the common law of England extended to waters declared navigable by it, even though we enlarge the field of navigability. By sec. 13 of art. XIV of the constitution the common law

of the territory not inconsistent with the constitution was expressly declared to continue to be a part of the law of the state until changed or suspended by legislative enactment.

The extent of the right of a state to regulate and control navigable waters and the soil beneath them, and to declare what waters are navigable, has not been clearly defined. Speaking upon the subject, the supreme court of the United States, in *Hardin v. Jordan,* 140 U. S. 371, 382, 11 Sup. Ct. 808, 838, says:

"This right of the states to regulate and control the shores of tide waters, and the land under them, is the same as that which is exercised by the Crown in England. In this country the same rule has been extended to our great navigable lakes, which are treated as inland seas; and also, in some of the states, to navigable rivers, as the Mississippi, the Missouri, the Ohio, and, in Pennsylvania, to all the permanent rivers of the state; but it depends on the law of each state to what waters and to what extent this prerogative of the state over the lands under water shall be exercised."

Some states have held that the right of hunting on a navigable stream cannot be exercised by the public. *Winous Point S. Club v. Bodi,* 20 Ohio C. C. 637; *State v. Shannon,* 36 Ohio St. 423. Nor on the navigable waters of a bay, where the ownership of the soil is in private parties. *Sterling v. Jackson,* 69 Mich. 488, 37 N. W. 485—so decided by a divided court of three to two. But if title to the soil under navigable waters is in the state, the right of the public to hunt on such waters exists. *Ainsworth v. Munoskong H. & F. Club,* 153 Mich. 185, 116 N. W. 992, 17 L. R. A. N. s. 1236. And in Illinois it is held the right to hunt and fish is not incident to the right of navigation. *Schulte v. Warren,* 218 Ill. 108, 75 N. E. 783. In Maine and Massachusetts the right of the public to hunt and fish upon inland navigable waters of any size is recognized. *Conant v. Jordan,* 107 Me. 227, 77 Atl. 938, 31 L. R. A. N. s. 434. Our court has never been called upon to determine the right of the public to hunt

on navigable waters the title to the bed of which is in private parties. In *Ne-pee-nauk Club v. Wilson,* 96 Wis. 290, 71 N. W. 661, it was held that riparian owners on a meandered lake had no exclusive right to hunt thereon, and the court, *obiter,* said: "The right of fishing and fowling upon such waters is in the owner of the soil which is under the water," citing *Hardin v. Jordan,* 140 U. S. 371, 11 Sup. Ct. 808, 838, and *Bristow v. Cormican,* L. R. 3 App. Cas. 641. The first case does not really so hold, and the English case was based upon the doctrine that the Crown had no right to non-tidal waters, and that there was no right in the public to fish in such waters.

In *Merwin v. Houghton,* 146 Wis. 398, 131 N. W. 838, the public right of hunting and fishing upon the navigable waters of the state was recognized and asserted, though not the direct subject of adjudication. The question there considered was the right to improve the navigability of a navigable stream, and it was urged that it should not be done because it would take away the right of the public to hunt and fish in certain navigable channels and widenings of the stream which the proposed improvement would destroy. But it was held that the rights of hunting and of fishing must, within reasonable limits, yield to the paramount right to improve the navigation of the stream.

The wisdom of the policy which, in the organic laws of our state, steadfastly and carefully preserved to the people the full and free use of public waters, cannot be questioned. Nor should it be limited or curtailed by narrow constructions. It should be interpreted in the broad and beneficent spirit that gave rise to it in order that the people may fully enjoy the intended benefits. Navigable waters are public waters and as such they should inure to the benefit of the public. They should be free to all for commerce, for travel, for recreation, and also for hunting and fishing, which are now mainly certain forms of recreation. Only by so construing the provi-

sions of our organic laws can the people reap the full benefit
of the grant secured to them therein.   This grant was made
to them before the state had any title to convey to private
parties, and it became a trustee of the people charged with
the faithful execution of the trust created for their benefit.
Riparian owners, therefore, took title to lands under naviga-
ble waters with notice of such trust and subject to the burdens
created by it.   It was intended that navigable waters should
be public navigable waters, and only by giving members of
the public equal rights thereon so far as navigation and its
incidents are concerned can they be said to be truly public.

Hunting on navigable waters is lawful when it is con-
fined strictly to such waters while they are in a navigable
stage, and between the boundaries of ordinary high-water
marks.   When so confined it is immaterial what the charac-
ter of the stream or water is.   It may be deep or shallow,
clear or covered with aquatic vegetation.   By ordinary high-
water mark is meant the point on the bank or shore up to
which the presence and action of the water is so continuous
as to leave a distinct mark either by erosion, destruction of
terrestrial vegetation, or other easily recognized characteris-
tic.   Lawrence v. American W. P. Co. 144 Wis. 556, 562,
128 N. W. 440.   And where the bank or shore at any partic-
ular place is of such a character that it is impossible or dif-
ficult to ascertain where the point of ordinary high-water
mark is, recourse may be had to other places on the bank or
shore of the same stream or lake to determine whether a given
stage of water is above or below ordinary high-water mark.

Whether the right exists in the public to hunt on a navi-
gable stream, between ordinary high-water marks, which,
owing to a low stage of water, is unnavigable, or on land be-
tween such marks which has become dry or exposed, is not in-
volved in this case and is not decided.

No exceptions were taken by either side to the correctness

of the trial court's findings of fact. And since they found that defendant hunted only on and over the navigable waters of this state, it follows from what has been said that the proper judgment was entered.

*By the Court.*—Judgment affirmed.

BARNES, J., took no part.

TIMLIN, J. I concur in the result upon the grounds that there is no finding that the defendant did any shooting and that it is not found or shown that the trespass described in the findings was within the boundaries of plaintiff's land (*Ne-pee-nauk Club v. Wilson,* 96 Wis. 290, 71 N. W. 661), or whether it was upon a lake or river. Many lakes could be described as the mere widening of a river. If that would in law transform a lake into a river, the law would depend upon the mere accidental and irrelevant circumstance that what might otherwise be considered the inlet and outlet of the river are given the same name. I do not think the right or privilege to shoot wild fowl flying over a stream is incident to or connected with the right of navigation of a stream where the riparian proprietors own the river bed by qualified title subject to navigation. Especially is this true where the stream was not returned as meandered by the United States survey, but sold by conveyances which include the river, its bed and its banks. I do not think any case in this court heretofore decided can fairly be said to decide this point, although there are argumentative statements to be found which if given legislative force might be construed to cover it.