N. PATRICK CROOKS, J.
¶ 153. (dissenting). This case presents a question that the majority can — indeed does — answer by interpreting Wis. Stat. § 31.02(1) (2009-10). Yet the majority unnecessarily reaches out to the constitutional principle of the public trust doctrine from the Wisconsin Constitution, constricting the doctrine and misreading this court's precedent, especially the well-settled law articulated in Just v. Marinette County, 56 Wis. 2d 7, 201 N.W.2d 761 (1972). Wisconsin's long and robust history of protecting the public trust is widely acknowledged and respected. The public trust doctrine imposes on the state, as trustee, the affirmative duty to protect, preserve, and promote the public's right to Wisconsin's waters.
¶ 154. The majority opinion attempts to undermine this court's precedent, recharacterize its holdings, and rewrite history. Instead of limiting itself to address *116 ing only what must be addressed, the majority seizes this opportunity to limit the public trust doctrine in an unforeseen way, transforming the state's affirmative duty to protect the public trust into a legislative choice. It needlessly unsettles our precedent and weakens the public trust doctrine that is enshrined in the Wisconsin Constitution. This represents a significant and disturbing shift in Wisconsin law.
¶ 155. The majority also errs in expanding the type of evidence that the Department of Natural Resources (DNR) must consider in these cases. A straightforward interpretation of Wis. Stat. § 31.02(1) would not require the DNR to consider secondary or indirect economic impact when making water level determinations. The economic evidence admitted during the ten-day contested case hearing was sufficient to discharge the DNR's duty to "protect. . . property," and the excluded evidence was not relevant or required. The DNR has a difficult job to do under this statute, and in this case, the DNR did it well. The decisions of the DNR, the circuit court, and the court of appeals each properly concluded that § 31.02(1) does not require consideration of such secondary or indirect economic impact. The fact is that the DNR sufficiently considered the protection of property, and therefore, it was not error to strike the secondary or indirect economic evidence that it struck.
¶ 156. For these reasons, I respectfully dissent.
I. WISCONSIN COURTS HAVE AGGRESSIVELY PROTECTED THE PUBLIC TRUST DOCTRINE.
¶ 157. To understand the significance and to see the potential implications of the majority's novel interpretation of the Just case, it is necessary to appreciate how settled the public trust doctrine has been in *117 Wisconsin until now. This court highlighted the constitutional basis of the public trust doctrine in Muench v. Public Service Commission, 261 Wis. 492, 53 N.W.2d 514, aff'd on reh'g, 261 Wis. 492, 55 N.W.2d 40 (1952). In that case, the court traced the history of the public trust doctrine to the Northwest Ordinance of 1787. Muench, 261 Wis. at 499. The language from the Northwest Ordinance of 1787 was then adopted by the territorial constitutional convention in 1848, approved by an act of Congress which admitted Wisconsin into the Union, and incorporated in the Wisconsin Constitution as follows:
The state shall have concurrent jurisdiction on all rivers and lakes bordering on this state so far as such rivers or lakes shall form a common boundary to the state and any other state or territory now or hereafter to be formed, and bounded by the same; and the river Mississippi and the navigable waters leading into the Mississippi and St. Lawrence, and the carrying places between the same, shall be common highways and forever free, as well to the inhabitants of the state as to the citizens of the United States, without any tax, impost or duty therefor.
Wis. Const, art. IX, § 1.
¶ 158. Early on, this court declared that the public trust not only required preservation of the trust, it also required promotion of it. City of Milwaukee v. State, 193 Wis. 423, 449, 214 N.W. 820 (1927) ("The equitable title to these submerged lands vests in the public at large, while the legal title vests in the state, restricted only by the trust, and the trust, being both active and administrative, requires the lawmaking body to act in all cases where action is necessary, not only to preserve the trust, but to promote it." (emphasis added)).
*118 ¶ 159. In Diana Shooting Club v. Husting, this court described the state's responsibilities under the public trust doctrine:
The wisdom of the policy which, in the organic laws of our state, steadfastly and carefully preserved to the people the full and free use of public waters cannot be questioned. Nor should it be limited or curtailed by narrow constructions. It should be interpreted in the broad and beneficent spirit that gave rise to it in order that the people may fully enjoy the intended benefits.
Diana Shooting Club, 156 Wis. 261, 271, 145 N.W. 816 (1914) (emphasis added).
¶ 160. The court in Muench adopted the language from Diana Shooting Club and demonstrated the growth of the public trust doctrine over time by describing its own holding as "keeping with the trend manifested in the development of the law of navigable waters in this state to extend the rights of the general public to the recreational use of the waters in this state, and to protect the public in the enjoyment of such rights." Muench, 261 Wis. at 512.
¶ 161. This court in Just v. Marinette County further interpreted the doctrine while upholding a shoreland zoning statute enacted pursuant to the state's public trust duty. The court stated:
The active public trust duty of the state of Wisconsin in respect to navigable waters requires the state not only to promote navigation but also to protect and preserve those waters for fishing, recreation, and scenic beauty. To further this duty, the legislature may delegate authority to local units of the government, which the state did by requiring counties to pass shoreland zoning ordinances.
Just, 56 Wis. 2d at 18 (emphasis added) (citations omitted). This court explained that the purpose of the *119 statute at issue in that case was to "protect navigable waters and the public rights therein from the degradation and deterioration which results from uncontrolled use and development of shorelands." Id. at 10. We noted that the stated purpose of the shoreland regulation program is to "aid in the fulfillment of the state's role as trustee of its navigable waters and to promote public health, safety, convenience and general welfare." Id.
¶ 162. Since then this court has consistently reiterated the purpose and the significance of the public trust doctrine in its cases. For example, Wisconsin's Environmental Decade, Inc. v. DNR (Environmental Decade 1978), described the duties of the state under the public trust as "not only to promote navigation but also to protect and preserve its waters for fishing, hunting, recreation, and scenic beauty." Envtl. Decade 1978, 85 Wis. 2d 518, 526, 271 N.W.2d 69 (1978). We described the state's responsibility as long-acknowledged and highlighted the legislature's delegation of water management to the DNR in furtherance of "the state's affirmative obligations as trustee." Id. at 526-27.
¶ 163. Recently, this court reiterated these principles in Lake Beulah Management District v. DNR, holding that under the applicable statutes and the public trust duties, the DNR can and must consider whether an inland well would harm waters of the state before issuing a permit for the well. Lake Beulah, 2011 WI 54, ¶ 3, 335 Wis. 2d 47, 799 N.W.2d 73. This court explained jurisprudence on the public trust doctrine:
We reaffirmed this maxim in Muench v. Public Service Commission in our examination of the history and evolution of the public trust doctrine, which indicated a "trend to extend and protect the rights of the public to the recreational enjoyment of the navigable waters of *120 the state." We have further explained, "The trust doctrine is not a narrow or crabbed concept of lakes and streams."
Id., ¶ 31 (emphasis added) (citations omitted).
¶ 164. Our cases demonstrate that the scope of the public trust doctrine is such that the state holds title to the land between the ordinary high water marks, and state regulation consistent with the public trust doctrine extends to surrounding areas. The ownership of land was emphasized in Diana Shooting Club, which was a case about trespass. In that case, there was no trespass because the hunter was hunting between the ordinary high water marks, land that was held in trust for the public. Diana Shooting Club, 156 Wis. at 272. In contrast, regulation consistent with the public trust doctrine was at issue in Just because the shore-land zoning statute extended well beyond the ordinary high water mark, and the court held that it could be regulated pursuant to the public trust doctrine. Just, 56 Wis. 2d at 14, 17.
¶ 165. In furtherance of the state's trustee responsibilities, the legislature has enacted statutes to discharge its duties. As the court explained in Environmental Decade 1978, several chapters of the Wisconsin statutes, including Chapter 31, which is at issue in this case, were enacted "[i]n furtherance of the state's affirmative obligations as trustee of navigable waters." 85 Wis. 2d at 527. We dealt with a similar situation in this court's unanimous decision in Lake Beulah, where the legislature had used a statute to implement its public trust duties. This court stated, "[W]e conclude that, through Wis. Stat. § 281.11 and § 281.12, the legislature has delegated the State's public trust duties to the DNR in the context of its regulation of high capacity *121 wells and their potential effect on navigable waters such as Lake Beulah." Lake Beulah, 335 Wis. 2d 47, ¶ 34 (emphasis added). That decision dealt with non-navigable water, and explained its relationship to the public trust doctrine. The statutes created to preserve and promote the public trust doctrine allowed the regulation of non-navigable waters because of the potential effects non-navigable waters have on navigable waters.
II. THE MAJORITY UNNECESSARILY UNDERMINES WELL-SETTLED LAW ON WISCONSIN'S PUBLIC TRUST DOCTRINE.
¶ 166. The heart of the public trust doctrine lies in protecting, preserving, and promoting the public's right to Wisconsin's waters, and this court has vigilantly guarded these rights. The public trust doctrine entrusts to the state the duty to protect, preserve, and promote the public trust. The majority untethers our constitutional jurisprudence from its foundation and attempts to transform 165 years of constitutional precedent into a mere legislative exercise of the state's police power. The citizens of Wisconsin may rightly wonder why the majority is limiting the protection of Wisconsin's waters and reaching a constitutional question that is not essential to its holding. I refuse to unnecessarily constrict our holdings on this important constitutional doctrine, especially in a case that should be decided on statutory grounds.[1]
*122 ¶ 167. The central issue in this case is one of statutory interpretation — namely, whether the DNR can consider wetlands above the ordinary high water mark when determining water levels under Wis. Stat. § 31.02(1). Wisconsin Stat. § 31.02(1) states in relevant part: "The department, in the interest of public rights in navigable waters or to promote safety and protect life, health and property[,] may regulate and control the level and flow of water in all navigable waters . . . ." Both the majority and the petitioner agree that a simple reading of § 31.02(1) demonstrates that the statute allows for consideration of private wetlands. In fact, the majority states: "The District acknowledges that 'privately owned wetlands are entitled to consideration as "property" to be protected in establishing a water level order.' There can be no dispute that the DNR can 'consider' water level impact on all adjacent property under Wis. Stat. § 31.02(1)." Majority op., ¶ 109. Because that interpretation is dispositive of the issue, I would stop the analysis there.
*123 ¶ 168. Instead, the majority reaches that conclusion and then embarks on a constitutional analysis in which it reads the part of the statute before the "or" to be a direct enactment of the public trust doctrine and the part after the "or" as an exercise of police powers. Majority op., ¶¶ 102-103. It speculates as to how the statute could have been written so it "would be seen as a direct enforcement mechanism for the public trust in navigable waters" while explaining that the actual language could not be a direct enforcement mechanism. Majority op., ¶ 103. The majority does not cite any cases that interpret Wis. Stat. § 31.02(1) the way it does now, and it ignores the cases that suggest that the entire statute is an embodiment of the public trust doctrine.[2] Reading the statute as the majority does attempts to strip the state, trustee of the public trust doctrine, of the ability to regulate anything that is not between the ordinary high water marks pursuant to the public trust doctrine. The majority reaches a constitutional issue that it is not required to reach, and it engages in a strained analysis to bolster its holding. Both Wis. Stat. § 31.02(1) and the long-settled public trust doctrine support a consideration of the impact on wetlands adjacent to Lake Koshkonong when regulating water levels pursuant to the public trust doctrine.
¶ 169. To support its holding, the majority misconstrues Just v. Marinette County. The majority calls the Just case "a textbook example of using the state's police power [as opposed to using the constitutional public trust doctrine] to support legislation 'to protect navigable waters and the public rights therein....'" *124 Majority op., ¶ 96. The majority uses this interpretation of Just to explain that the statute at issue here, § 31.02(1), is only half based on the public trust doctrine; the rest, as the majority would have us believe, derives only from the state's police power and is disconnected from the public trust doctrine.[3]
¶ 170. The clear language of Just rebuts the majority's conclusion that it was only a police power case.[4] The thrust of the Just opinion showed that the *125 court believed it was relying on the public trust doctrine. The court explicitly held that land above the *126 ordinary high water mark is subject to the public trust doctrine. Just, 56 Wis. 2d at 18-19 ("Lands adjacent to or near navigable waters exist in a special relationship to the state. They have been held subject to special taxation and are subject to the state public trust powers . . . ." (emphasis added) (citations omitted)).
¶ 171. In an attempt to circumvent the clear language of the Just case, the majority makes a circular argument. The majority imports its conclusion from earlier in the opinion — that the public trust does not extend beyond the ordinary high water mark — and applies it to support its subsequent conclusion.[5] Regarding Just, it states:
If there is any question that the court was not relying on the public trust doctrine to sustain the shoreland zoning ordinance and its authorizing legislation, the court noted that the Marinette County ordinance applied to "lands within 1,000 feet of the normal high-water elevation of navigable lakes, ponds, or flowages and 300 feet from a navigable river or stream." These dimensions far exceed the geographic limitations of public trust jurisdiction.
Majority op., ¶ 100 (citation omitted). The majority's only apparent support for its conclusion about the dimensions of the public trust jurisdiction comes from its own earlier analysis. The Just case establishes the opposite conclusion — that the DNR pursuant to the public trust doctrine may consider the impact on land above the ordinary high water mark.
¶ 172. Not only does an appropriate interpretation of Just rebut the majority's conclusions, this court has repeatedly interpreted the public trust doctrine more broadly than the majority does today, and there is *127 no compelling reason presented in this case to change that interpretation. See supra, ¶¶ 161-165. The case law indicates that the state has the power to regulate lands beyond the ordinary high water mark in discharging the duties entrusted to it under the public trust doctrine. See, e.g., Lake Beulah, 335 Wis. 2d 47, ¶ 34. Likewise, the cases demonstrate that the legislature has an affirmative duty as trustee to protect and promote the public trust. See, e.g., City of Milwaukee, 193 Wis. at 449.
¶ 173. One explanation for the majority's puzzling holding is that it appears to confuse the concepts of ownership of (or title to) the land with regulation pursuant to the public trust doctrine. In the cases the majority cites to support its position that public trust jurisdiction is confined to limited geographic areas, the idea of ownership of the land was paramount, but here, ownership of the private wetlands is not at issue.[6] The issue is only whether the DNR has the authority under the public trust doctrine to consider the impact on those adjacent wetlands consistent with its duties under the public trust doctrine. After citing cases it believes support its proposition that the public trust doctrine is limited to water between the ordinary high water marks, the majority explains the problem it sees:
Contemplating the question of ownership is important because the public trust doctrine implicates state ownership or virtual state ownership — -by virtue of its trust responsibility — of land under navigable waters. If the public trust were extended to cover wetlands that are not navigable, it would create significant new questions about ownership of and trespass on private land, and it *128 would be difficult to cabin expansion of the state's new constitutionally based jurisdiction over private land.
Majority op., ¶ 84. The quotation from the majority demonstrates its misunderstanding of the argument of the DNR. The DNR in this case was not asserting that the public trust doctrine gives the state ownership of the private wetlands; rather it argues that the public trust doctrine allows the DNR to consider the impact on the wetlands when determining water levels. It quotes the Just court's statement that "[l]ands adjacent to or near navigable waters . . . are subject to the state public trust powers" and emphasizes the Just decision's reference to the wetlands "adjacent to" not "within" navigable waters.
¶ 174. Allowing the trustee to discharge its public trust duties by considering things that affect navigable waters is consistent with our precedent. If it could not, how then would the state discharge its extensive duties "not only to promote navigation but also to protect and preserve its waters for fishing, hunting, recreation, and scenic beauty"? Envtl. Decade 1978, 85 Wis. 2d at 526 (citations omitted). Therefore, the DNR did not err in relying on its public trust power to consider the impact of raising the water levels on adjacent private wetlands even when the wetlands are above the ordinary high water mark. The conclusion the majority reaches is a novel interpretation that cannot be squared with the extensive public trust doctrine case law.
III. THE "PROTECT... PROPERTY" ELEMENT OF WIS. STAT. § 31.02(1) DOES NOT REQUIRE ADMISSION OF THE STRICKEN EVIDENCE.
¶ 175. Despite acknowledging that the decision adopted by the DNR was "meticulous [and] comprehen *129 sive," the majority reverses, holding that the DNR was required to consider additional evidence on the secondary or indirect economic impacts of raising the water level when making its determination under Wis. Stat. § 31.02(1).[7] Because I do not believe the statute requires the DNR to consider the evidence that was stricken to discharge its duty to "protect. . . property," I dissent.
¶ 176. During the ten-day contested case hearing, a significant amount of evidence was heard. The parties presented testimony and other evidence related to the economic impact of the change in the water level, including testimony on the implications for navigation, information about the impact on use and enjoyment of riparian property by riparian owners, impact on fish and fowl, and information about the impact on natural beauty and recreation. Some evidence was later stricken from the record on the grounds that the " [secondary or indirect economic impacts of a water level determination do not bear on the statutory standard set forth in section 31.02(1)." The stricken evidence included testimony and exhibits from experts who testified as to the potential economic effects of the water level determination on residential property values, business incomes, and tax revenues. However, the DNR's decision specifically noted its consideration of riparian property owner's interests in their property:
The diminished ease of access experienced by many riparians and their desire for higher water levels, *130 reflects their diminished utility and enjoyment of their property, which doubtless reduces the value of that property to them. This diminished utility and enjoyment of the property, and the expectation that higher water would enhance the utility and enjoyment of riparian property, has been considered and weighed under the standards of Wis. Stat. § 31.02(1).
(Emphasis added).
¶ 177. As explained above, Wis. Stat. § 31.02(1) states: "The department, in the interest of public rights in navigable waters or to promote safety and protect life, health and property[,] may regulate and control the level and flow of water in all navigable waters . . . ." Wis. Stat. § 31.02(1) (emphasis added). The majority focuses on "protect. . . property" and interprets it to mean that striking the secondary or indirect economic impact evidence constituted reversible error. The more reasonable interpretation of the statute, as demonstrated by the quotation set forth above, is that the DNR sufficiently considered the protection of property when making its determination under Wis. Stat. § 31.02(1).
¶ 178. In other statutes that the DNR administers, the legislature has specifically included language about such economic impact, whereas in § 31.02(1) the legislature has not signaled that the DNR must consider such secondary or indirect economic impact. For example, Wis. Stat. § 30.195(2)(c)2 requires consideration of whether the proposed change "will improve the economic or aesthetic value of the applicant's land." Wisconsin Stat. § 285.01(12) requires the DNR to consider "energy, economic and environmental impacts and other costs" to determine air-pollution regulation. The DNR's permitting process for dams under Wis. Stat. § 31.06(3)(b) looks at whether the proposal is "in the *131 public interest, considering ecological, aesthetic, economic and recreational values." None of this language is present in Wis. Stat. § 31.02(1). If the legislature intended that the DNR must consider such secondary or indirect economic impact, the legislature would have drafted the statute to signal such a requirement.[8]
¶ 179. As the court of appeals aptly observed, the District's interpretation, now adopted by the majority, has no logical stopping point. Rock-Koshkonong Lake Dist. v. DNR, 2011 WI App 115, ¶ 43, 336 Wis. 2d 677, 803 N.W.2d 853. If it is reversible error not to consider this type of secondary or indirect economic impact, what evidence is the fact-finder, in its discretion, allowed to exclude? The court of appeals explained this problem:
For example, it is unclear under the District's construction whether the DNR's consideration of economic effects on real property would he limited to property values of riparian owners or would also include the values of adjacent or area properties not situated directly on the lake. Similarly, if the DNR were required to consider revenues of businesses directly linked to lake recreational activities, like marinas and bait shops, would it also be required to consider revenues of businesses with less direct links to use of navigable waters, such as gas stations and convenience stores?
Id., ¶ 43. The majority's interpretation of this statute adds an unnecessary layer of confusion for the DNR when reviewing these cases.
*132 ¶ 180. Instead of applying the governing statute or this court's interpretation of similar statutes, the majority relies on language from Railroad Commission cases from the early 1900s to support its conclusion that the legislature in 1915 did not intend to exclude riparian rights from consideration in Wis. Stat. § 31.02(1), and that therefore, it was reversible error to exclude evidence of such secondary or indirect economic impact to water level changes.[9] The language in these Railroad Commission decisions, on closer examination, supports the DNR's position that the duty to protect property requires consideration of only physical impacts on property. The majority finds its support, in one case, by focusing on what the Railroad Commission did not say — which is dubious support at best. It finds its support in the second case by focusing on a passing reference to private development, while not acknowledging the actual basis given by the Railroad Commission for its holding — which clearly focuses on the potential for shoreline and property "to be destroyed."
*133 ¶ 181. The first of the Railroad Commission cases on which the majority relies, Town of Bear Lake v. Wisconsin-Minnesota Light & Power Co., 16 W.R.C.R. 710 (1915), involved a dispute over the water level maintained by a dam and that level's physical impact on surrounding land. The Railroad Commission stated: "[t]his level will not endanger life or health . .. [i]t will, however, affect property and overflow a large acreage of land. . . ." Id. at 716. The majority explains that the Railroad Commission's decision "did not explicitly limit the protection of property to only direct physical impacts." Majority op., ¶ 137. The absence of an explicit limitation is not evidence that the statute requires consideration of such secondary or indirect economic impact; it is the natural result of the fact that Bear Lake was about physical flooding of property.
¶ 182. The other Railroad Commission case, In re Determining the High Water Mark to be Established on the Rest Lake Reservoir Operated by the Chippewa and Flambeau Improvement Co., 16 W.R.C.R. 727, 731 (1915), considered Rest Lake's water level, and like the Bear Lake decision, involved severe physical damage to property. The Chippewa & Flambeau Improvement Company requested permission from the Railroad Commission to adopt certain high and low water marks, but property owners vigorously protested — arguing that the wide variation in water levels negatively affected their property. Id. at 731. The Railroad Commission agreed with property owners that the "disastrous effects upon shore property are only too plainly visible" from such a great variation in the water level. Id. at 734. It described the consequences as follows:
Banks are lined with dead trees, logs, rocks and debris in an effort to prevent the shore lines from being obliterated. . .. When the banks give away large trees *134 fall into the water. In one instance, thirty large green timber trees were counted lying in the lake where the shore had been taken away this year.... In places the old shore lines have disappeared.... The gradual disappearance of what are now islands was fully shown by the testimony.
Id. While the Railroad Commission briefly mentioned that large sums of money were used to improve private homes along the lake, its ultimate reason for protecting this property was concern for potential physical damage rather than secondary or indirect economic impact. In denying the petition, the Railroad Commission found, "[t]he effect of [the proposed water level] will be to give a very wide variation in levels, tending to destroy the shore line and property around the lakes." Id. at 738 (emphasis added). Neither of these cases supports the majority's conclusion about the legislative intent in 1915.
¶ 183. Further, the majority minimizes this court's past interpretation of similar statutory language, which has explicitly limited its reading to a narrow interpretation of the language. In City of New Lisbon v. Harebo, this Court held that a dam may "endanger property" when "by reason of its location, or manner of construction, or the character of the soil upon which it is built... it [would] tend to flood cities or villages or [would be] likely to give way and create havoc and destruction below the dam . . .." New Lisbon, 224 Wis. 66, 73, 271 N.W. 659 (1937). We made sure to point out that "we are of the opinion that this is as much as the section can be held to mean." Id. Thus, this court expressly limited the construction of "endanger property," and concluded that a dam would not endanger property if injury to the property resulted from "normal flowage by the ordinary operation of the dam." Id. The *135 court's narrow reading of "endanger property" as applying to only physical damage and hydrologic events supports a limited reading of "protect. . . property" in Wis. Stat. § 31.02.[10]
¶ 184. It is illogical and contrary to the plain meaning of the statute to hold, as the majority does, that language referring to "protecting] life, health and property" requires the DNR to consider such secondary or indirect economic impacts. It is apparent that the cases relied on by the majority do not lead to its conclusion. Further, contrary to the majority's position, the plain language is clear and certainly does not compel the majority's conclusion. The fact is that the DNR sufficiently considered the protection of property, and therefore, I conclude that it was not error to strike the secondary or indirect economic evidence that it struck.
IV CONCLUSION
¶ 185. This case presents a question that the majority can — indeed does — answer by interpreting Wis. Stat. § 31.02(1). Yet the majority unnecessarily reaches out to the constitutional principle of the public *136 trust doctrine from the Wisconsin Constitution, constricting the doctrine and misreading this court's precedent, especially the well-settled law articulated in Just v. Marinette County. Wisconsin's long and robust history of protecting the public trust is widely acknowledged and respected. The public trust doctrine imposes on the state, as trustee, the affirmative duty to protect, preserve, and promote the public's right to Wisconsin's waters.
¶ 186. The majority opinion attempts to undermine this court's precedent, recharacterize its holdings, and rewrite history. Instead of limiting itself to addressing only what must be addressed, the majority seizes this opportunity to limit the public trust doctrine in an unforeseen way, transforming the state's affirmative duty to protect the public trust into a legislative choice. It needlessly unsettles our precedent and weakens the public trust doctrine that is enshrined in the Wisconsin Constitution. This represents a significant and disturbing shift in Wisconsin law.
¶ 187. The majority also errs in expanding the type of evidence that the DNR must consider in these cases. A straightforward interpretation of Wis. Stat. § 31.02(1) would not require the DNR to consider secondary or indirect economic impact when making water level determinations. The economic evidence admitted during the ten-day contested case hearing was sufficient to discharge the DNR's duty to "protect.. . property," and the excluded evidence was not relevant or required. The DNR has a difficult job to do under this statute, and in this case, the DNR did it well. The decisions of the DNR, the circuit court, and the court of appeals each properly concluded that § 31.02(1) does not require consideration of such secondary or indirect economic impact. The fact is that the DNR sufficiently *137 considered the protection of property, and therefore, it was not error to strike the secondary or indirect economic evidence that it struck.
¶ 188. For the foregoing reasons I respectfully dissent.
¶ 189. I am authorized to state that Chief Justice SHIRLEY S. ABRAHAMSON and Justice ANN WALSH BRADLEY join this dissent.

 Two other issues are decided by the majority. The first is the standard of review. The majority lays out the appropriate framework to determine the standard of review. It then determines that the standard of review here should be de novo review because it believes that the DNR has not consistently inter *122 preted Wis. Stat. § 31.02(1) and that the question presented is one of the scope of the DNR's power. Majority op., ¶¶ 58-64. Because I would reach the same result under any level of deference, I will not address the majority's application of the oft-cited rules from Racine Harley-Davidson, Inc. v. State, 2006 WI 86, 292 Wis. 2d 549, 717 N.W.2d 184. See also Hilton ex rel. Pages Homeowners' Ass'n v. DNR, 2006 WI 84, 293 Wis. 2d 1, 717 N.W.2d 166 (discussing the standard of review of an agency decision in a case related to the public trust doctrine). Even applying de novo review, the DNR's interpretations were reasonable and should therefore be affirmed.
The second issue decided by the majority is whether Wis. Stat. § 281.92 bars the DNR from considering water quality standards from Wis. Admin. Code § NR 103 when making its determination under § 31.02(1). I agree with the majority that Wis. Stat. § 281.92 does not bar the DNR from such a consideration.

 See discussion of Wisconsin's Environmental Decade, Inc., v. DNR (Environmental Decade 1978), 85 Wis. 2d 518, 271 N.W.2d 69 (1978) and Lake Beulah Management Dist. v. DNR, 2011 WI 54, 335 Wis. 2d 47, 799 N.W.2d 73, at ¶ 165.

 Although it does not answer why it matters in this case, the majority leaves no doubt about the significance of its novel interpretation of the Just case, namely that it changes the ease with which the legislature can modify regulation and creates a more lenient legal standard for this court to apply when it reviews such changes:
The police power is potent, and legislation grounded in the state's police power is presumed constitutional and will be sustained unless it is deemed unconstitutional beyond a reasonable doubt. Nonetheless, as Just makes clear, the distinction between the DNR's constitutionally based public trust authority and the DNR's police power-based statutory authority is that the latter is subject to constitutional and statutory protections afforded to property, may be modified from time to time by the legislature, and requires some balancing of competing interests in enforcement.
Majority op., ¶ 101. In other words, rights that are not protected by the constitution are easier to take away. In addition, the majority's interpretation transforms what was an affirmative duty on the state as trustee into a right to regulate when the legislature chooses to do so, allowing the state to ignore its duty with respect to things that impact navigable waters but are not physically located between the ordinary high water marks.

 Scholarship interpreting Just supports the conclusion that this court extended the public trust doctrine through Just to allow for regulation above the ordinary high water mark. See, e.g., Melissa K. Scanlan, Implementing the Public Trust Doctrine: A Lakeside View into the Trustees' World, 39 Ecology L.Q. 123,138 (2012) (explaining that "[a]s scientific knowledge about *125 the interconnectedness of hydrology has increased, courts and the legislature have expanded the public trust doctrine to cover activities on shorelands, wetlands, nonnavigable waters, and groundwater adjacent to navigable waters."); Richard M. Frank, The Public Trust Doctrine: Assessing Its Recent Past & Charting Its Future, 45 U.C. Davis L. Rev. 665, 668 (2012) ("[I]n a controversial 1972 decision, the Wisconsin Supreme Court expressly [held] that the public trust doctrine could be asserted to bar the filling of privately-owned wetlands, in order to preserve those wetlands in their natural condition."); Jason J. Czarnezki, Environmentalism and the Wisconsin Constitution, 90 Marq. L. Rev. 465, 470, 494 (2007) (referencing Just to support a statement that the constitutionality of shoreland and wetland protection via zoning ordinances was upheld under the public trust doctrine and citing Just in concluding that "the constitution might textually embrace the notion that private property owners do not have inherent rights to change the 'essential natural character of their land' for development purposes.").
See also Paul G. Kent & Tamara A. Dudiak, Wisconsin Water Law: A Guide to Water Rights and Regulations 1, 12 (2d ed. 2001), http://learningstore.uwex.edu/assets/pdfs/g3622.pdf (stating that "because of the importance of public trust, the courts have used the public trust doctrine as a justification for regulation of shoreland and wetland areas adjacent to natural navigable waters on the theory that such regulation is necessary to protect public trust waters and to ensure the right of the public to access those waters." (citation omitted)); Melissa K. Scanlan, The Evolution of the Public Trust Doctrine and the Degradation of Trust Resources: Courts, Trustees and Political Power in Wisconsin, 27 Ecology L.Q. 135,165 (2000) (citing Just in a section entitled "Cases in Which Trustees Acted to Further the Trust"); Patrick O. Dunphy, The Public Trust Doctrine, 59 Marq. L. Rev. 787, 807 (1976) (explaining Just, "The strong public trust doctrine in Wisconsin may have been the most significant reason for the court's initiative. ... By recognizing the interrelationship of the land and the water and extending the trust to shorelands, the court has added a new dimension to the trust.")

 For an explanation of why the majority mistakenly believes that the public trust doctrine cannot extend beyond the ordinary high water marks, see infra, ¶ 172.

 See, e.g., Diana Shooting Club v. Husting, 156 Wis. 261, 272, 145 N.W. 816 (1914) (holding that no trespass occurred because the hunter was located between the ordinary high water marks, property which was land held in trust for the public pursuant to the public trust doctrine).

 The majority holds: "We find that history, purpose, precedent, and the DNR's past practice support a broad interpretation of the phrase 'protect... property' so that the DNR is not limited to consideration of hydrologic damage to real property and riparian rights when making a water level determination under Wis. Stat. § 31.02(1)." Majority op., ¶ 132.

 Further support for this proposition is found in the majority's explanation of zoning ordinances which explicitly require a consideration of the "tax base" when making zoning decisions. Majority op., ¶ 141. Wisconsin Stat. § 31.02(1) contains no such language evincing the legislature's intent that the DNR consider secondary or indirect economic evidence.

 The majority also relies on a legislative report from 1910, Report of the Comm, on Water Powers, Forestry, and Drainage of the Wis. Leg. 1910, 49th Leg., which explained that land near the shores of lakes was becoming very valuable. See majority op., ¶ 135. The majority then states: "In light of the legislative reports giving rise to the Water Powers Act containing the 'protect.. . property' language of Wis. Stat. § 31.02(1), one can reasonably infer that riparian residential property and lake-based businesses were prime considerations for protecting property." Id., ¶ 136. The majority fails to connect the observations in the legislative report with its "reasonable inference." One could just as reasonably infer that protection from physical damage to lakeshore property was the prime consideration for including language about protecting property in the statute and that the legislature did not expect the Railroad Commission to consider such secondary or indirect economic impact from changing water levels.

 Another case that provides support for the conclusion that such secondary or indirect economic impact is not required to be considered is Wisconsin's Environmental Decade, Inc., v. DNR (Environmental Decade 1983), 115 Wis. 2d 381, 340 N.W.2d 722 (1983). In Environmental Decade 1983, this court held that the DNR did not need to consider socioeconomic impact in determining whether it needed to issue an environmental impact study in connection with a permit. Id. at 395. While it is distinguishable on its facts (as noted by the majority), I agree with the DNR decision's assessment that this court's reasoning in Environmental Decade 1983 "applies with similar force here, even though that case involved action by the DNR under Chapter 30, not Chapter 31, Stats."